## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br> Plaintiff,<br><br>       v.<br><br>**ALEXIS MANUEL VIDAL-COLLAZO,**<br>Defendant. | CRIM. NO. 22-356 (ADC-MDM) |

## REPORT AND RECOMMENDATION

On August 5, 2022, agents from the Puerto Rico Police Bureau ("PRPB") executed a state issued search warrant on the home of the defendant, Alexis Manuel Vidal-Collazo ("defendant"). As a result of the search, PRPB agents seized one (1) .40-caliber Glock pistol, Model 23, together with 110 rounds of .40 caliber ammunition, that was found in the defendant's bedroom underneath his bed. Because the defendant has a prior conviction for a felony punishable by more than one year of imprisonment, the grand jury returned a one-count indictment charging him with being a felon in possession of a firearm and ammunition, in violation of Title 18, *United States Code*, Section 922(g)(1) ("Indictment").

### I.    Introduction and Procedural History

#### A. *The Motion to Suppress and for a Franks Hearing*

Pending before the Court is the defendant's Motion to Suppress Evidence and for [a] *Franks* Hearing[1] ("Motion to Suppress"). *See* Docket No. 30. In his Motion to Suppress, the defendant argued that the firearm evidence recovered from his residence and the subsequent confession he made to law enforcement should be suppressed for three reasons.

First, the record demonstrates by a preponderance of the evidence that the PRPB Agent in charge of investigating the case, Luis G. Ríos Camacho ("Agent Ríos"), knowingly and intentionally included false statements in his affidavit in support of

---

[1] *See Franks v. Delaware*, 438 U.S. 154 (1978).

the state issued warrant to search the defendant's home (the "Warrant"), which statements if removed from the Warrant, would not give rise to probable cause.

Second, the PRPB agents who executed the Warrant acted outside of judicial authorization by executing the Warrant during the nighttime hours, namely at 4:57AM, after the state municipal court judge specifically ordered the search to be conducted "only . . . during the daytime hours." The defendant avers that this violation should trigger a *per se* suppression of the evidence. Defendant further claims that even if the Court were to find that that conduct does not trigger a *per se* violation, the record nevertheless demonstrates that the pre-dawn execution of the Warrant resulted in prejudicial error because the search would have been significantly less abrasive had it been executed during the daytime hours.

And third, the incriminating statements he gave to law enforcement during his custodial interview at the Homicide Division in Fajardo were not knowingly and voluntarily given and they lacked his consent because a) he is intellectually disabled, illiterate and suffers from significant memory deficits that preclude him from being able to provide a knowing and intelligent consent to be interviewed, and b) he was subjected to a highly coercive environment by the agents when they threatened to arrest his elderly father until he agreed to incriminate himself.

### B. Government's Opposition

The Government filed an opposition to the Motion to Suppress ("Opposition") wherein it argued, first, that because the defendant did not claim ownership over the firearm or the ammunition in the Motion to Suppress, he necessarily failed to establish that he enjoyed any privacy interest over those items, and therefore, lacks standing to challenge their seizure. S*ee* Docket No. 39. Second, it argued that although the Warrant was executed at 4:57AM, which admittedly was one hour and three minutes before the federal rules declare the beginning of daytime searches,[2] based on a totality of the circumstances analysis, the agents acted reasonably and in

---

[2] *See* Fed.R.Crim.P. 41(a)(2)(B), which provides that "'daytime' means the hours between 6:00 a.m. and 10:00 p.m. according to local time."

good-faith reliance on the state municipal court judge's approval of the warrant application. And third, with respect to the defendant's argument that his incriminating statements were given involuntarily, the Government disputed that contention and cited to, among other things, the defendant's prior exposure to the criminal justice system and the more than sixteen-minute[3] recorded interview of the defendant wherein federal agents can be heard explaining in detail his *Miranda* rights prior to him making any incriminating statements. The Government also claimed that there was a legitimate investigatory reason for detaining the defendant's father, therefore, any statements made to the defendant about his father were not mere threats intended to induce him into incriminating himself.

The defendant filed a reply to the Government's Opposition ("Reply"). *See* Docket No. 41.

### C. *Hearings on the Motion to Suppress*

The Motion to Suppress was referred to the undersigned for the setting of a hearing and the preparation of a report and recommendation. *See* Docket No. 32.

#### 1. The Order Setting the Hearing

In setting the hearing, the Court issued a detailed Docket Entry Order explaining its rationale for granting a hearing versus deciding the matter on the briefs ("Order Setting a Hearing"). *See* Docket No. 52. In the Order Setting a Hearing, the Court found that, substantive questions of fact exist that are related to 1) the law enforcement agent's ability to see the firearm in the waistband of the defendant on the two occasions mentioned in the application for the Warrant, especially given the location of the red number "23" on the slide of the pistol, 2) the legality of the execution of the Warrant at 4:57 AM when the Warrant specified that it should be executed during daylight hours only, and 3) whether defendant's statements should be suppressed given his purported lack of competency to provide a knowing and

---

[3] The sixteen minutes includes both interviews of the defendant that were conducted only minutes apart. One starting at approximately 2:02PM on August 5, 2022 and the second starting at approximately 2:29PM that same day.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 4

voluntary waiver and the purportedly "coercive environment in which those statements were obtained." *See* Docket No. 52.

### 2. The Alleged Lack of Standing

In that same Order Setting a Hearing, the Court also addressed the Government's argument regarding defendant's purported lack of standing to challenge the seizure of the firearm and ammunition. More specifically, the Court stated that,

> With respect to the Government's argument that the defendant lacks standing to challenge the seizure of the firearm, the Court is perplexed by the Government's statement that the "defendant does not establish a privacy interest in that weapon or the rounds of ammunition because he does not claim ownership of either." Such a statement does not comport with the Government's own evidence submitted together with its opposition. For example, on page 10 of the transcript from the defendant's first interview with law enforcement, he states that, "[t]hey took my wallet and kept looking and they found my gun and I said: "Look, that's mine, he [the defendant's father] has nothing to do with it." *See* Docket No. 39-5 at 10 of 30. On page 12 of that same transcript, moreover, the defendant was asked, "So . . . why do you have the gun?" after which, the defendant responded with a long, and albeit confusing, explanation as to why he has the gun. *Id.* at 12. Then, on page 13, the defendant was asked specifically "When did you buy the gun?" To wit he responded, "I haven't had it long." *Id.* at 13. And finally, on page 14 of the same transcript, he was asked "How much did you pay for it?" and he responded, "I paid . . . I don't know. Like . . . cheap." *Id.* at 14. Unless the Court is mistaken, the Government might consider withdrawing such argument to conserve judicial resources during the hearing.

Though, to this date, the Government has not officially withdrawn its argument attacking defendant's standing to challenge the seizure of the firearm and ammunition, that argument was not raised at any time during the evidentiary hearing, nor was it discussed in the Government's Post-Hearing Brief. The Court

Case 3:22-cr-00356-ADC-MDM    Document 271    Filed 01/10/25    Page 5 of 71

*United States v. Alexis Vidal-Collazo*                                                Page 5
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

understands, therefore, that by default, the "standing" argument has been waived by the Government. *United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . . "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace.").

3. <u>Order of the Evidence Presented</u>

On August 2, 2023, the Court held what would end up being the first of seven days of evidentiary hearings over a period of many months. Sprinkled throughout those seven hearing days were a myriad of other discovery issues, each of which garnered their own set of hearings before the Court.

On the first day of the evidentiary hearing, and prior to hearing any testimony, the Court tackled the question of which party was to present its case first. Given the facts of the case, the Court noted the presence of mixed burdens of production and persuasion with respect to the issues presented. Namely, the defendant carries the burden under *Franks v. Delaware* to prove by preponderance of the evidence that the agent who swore out the affidavit in support of the application for a warrant, knowingly and intentionally, or with reckless disregard for the truth, included materially false statements or demonstrated reckless disregard for the truth in his affidavit (*see Franks v. Delaware*, 438 U.S. at 155-56), while the Government carries the burden of demonstrating by a preponderance of the evidence that the defendant knowingly and voluntarily waived his *Miranda* rights during the custodial interrogation. *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020). Over the objection of the Government, and to allow for a more seamless presentation of the evidence, the Court ordered the Government to present its case first.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 6

Accordingly, the Government called three witnesses:

1)      Agent Luis G. Ríos Camacho ("Agent Ríos"), who was the investigating agent who swore out the affidavit in support of the applications for the Warrant and for a search warrant for defendant's vehicle.[4] *See* Docket No. 88 at 27-145; Docket No. 89 at 169-201; and Docket No. 192 at 85-235.

2)      PRPB Agent José A. Díaz-García ("Agent Díaz"), who was the PRPB Agent in charge of executing the search warrants for the defendant's home and vehicle. *See* Docket No. 191 at 21-87.

3)      Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Joshua Burgos, who was the federal agent who interviewed the defendant during which interview the defendant gave several incriminating statements. *See* Docket No. 192 at 9-84.

The defendant then called six witnesses:

1)      Dr. Alexandra Ramos Duchateau ("Dr. Ramos"), who was called to testify as an expert in the field of psychology to explain the results of the psycho-diagnostic examination she performed on the defendant. *See* Docket No. 211 at 16-72; and Docket No. 246 at 5-21 (Re-cross).

2)      Linette Guzmán Vázquez ("Ms. Guzmán"), Security Services Coordinator for the telecommunications company Claro, who was called to authenticate certain toll records related to a multitude of text messages exchanged between the cellphone numbers belonging to Agent Ríos and Ms. Viviannette Rivera, the defendant's former consensual partner.  *See* Docket No. 211 at 73-83.

3)      Maribel Burgos Burgos ("Nurse Burgos"), a nurse, who works for New Medical Services in Luquillo, Puerto Rico, who was called to testify as to the

---

[4] Agent Ríos was initially called by the Government as its first witness to testify as to his overall involvement in the investigation and the swearing out of his affidavit in support of the Warrant. However, the Government later requested leave of the Court to recall Agent Ríos after a series of WhatsApp text messages surfaced between him and the defendant's then consensual partner, Viviannette Rivera, demonstrating that she was cooperating with Agent Ríos and was providing him relevant real-time information having to do with his surveillance of the defendant.

Case 3:22-cr-00356-ADC-MDM    Document 271    Filed 01/10/25    Page 7 of 71

*United States v. Alexis Vidal-Collazo*                                                            Page 7
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

treatment she provided to the defendant in the Emergency Room on August 1, 2022, the day before Agent Ríos conducted his surveillance on the defendant's home. *See* Docket No. 211 at 84-111.

4)      José Manuel Vidal Velázquez ("Mr. Vidal"), the defendant's father, who lived with the defendant[5] and who was at home on August 5, 2022, the day the Warrant was executed. *See* Docket No. 211 at 111-179.

5)      Carlos Alberto Rosario Cruz ("Mr. Rosario"), who works for a company called Digital Evidence, was called as a technology expert in the field of Cellebrite[6] cell phone extractions and Cellebrite extraction reports. *See* Docket No. 217 at 25-87.

6)      Mari Julia Rivera ("Ms. Rivera"), a Defense Investigator for the Office of the Federal Public Defender. Ms. Rivera was called to testify about her review of certain pieces of discovery. *See* Docket No. 87-102.

After both sides rested their respective cases, the Court ordered the parties to file post-hearing briefs. The defendant filed his post-hearing brief on September 9, 2024. (defendant's "Post-Hearing Brief") *(see* Docket No. 247), and then the Government filed its opposition on September 27, 2024 (Government's "Post-Hearing Opposition"). S*ee* Docket No. 254. The defendant filed a reply on October 4, 2024 (defendant's "Post-Hearing Reply"). *See* Docket No. 258.

After listening to the testimony presented, evaluating the exhibits, and making the necessary credibility assessments, and upon careful consideration of the arguments raised by the parties, and based on the factual findings and legal analysis that follows, the Court finds that PRPB Agent Luis G. Ríos Camacho knowingly and intentionally included false statements in the Affidavit such that, after removing those statements, the Warrant no longer gives rise to probable cause for a search of

---

[5] The record reveals that José Vidal Velázquez' wife, the defendant's mother, also lived with them in the same house, however, she was not at home on the day of the search as she was on vacation in Jacksonville, Florida. Docket No. 211 at 139.

[6] Cellebrite is a company engaged in creating a software that is specifically designed for extracting information from cellphones, including, in particular, metadata generated by the cellphones. *See* Docket No. 217 at 31.

the defendant's residence. The Court also finds that, although the defendant is capable of knowingly waiving his Fifth Amendment right to remain silent, that consent in this case was tainted by intimidation, coercion and deception, and thus was involuntary, due to law enforcement's threats to arrest the defendant's father unless he agreed to confess to possessing the firearm. Accordingly, the undersigned **RECOMMENDS** that the defendant's Motion to Suppress be **GRANTED**.

## II.    Legal Discussion

### A.   *The Defendant's Challenge to the Warrant based on Franks v. Delaware*

#### 1.   <u>Legal standard under *Franks v. Delaware*</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and generally requires law enforcement agents to secure a warrant supported by probable cause prior to effecting a search or seizure. *United States v. Rigaud*, 664 F.3d 169, 173 (1st Cir. 2012) (citing *United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011)). Probable cause exists when the totality of the circumstances suggest that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (citing *United States v. Hicks*, 575 F.3d 130, 136 (1st Cir. 2009) (internal quotation marks omitted)).

Information supporting probable cause is set out in an affidavit submitted with the application for a search warrant. Although "[t]here is . . . a presumption of validity with respect to the affidavit supporting the search warrant," that presumption may be refuted during what is known as a *Franks* hearing. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To obtain a *Franks* hearing, however, a party must first make two "substantial preliminary showings:" First, that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth; and second, that the falsehood or omission was necessary to the finding of probable cause. *See id.* at 155–56; *Hicks*, 575 F.3d at 138; *United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002). In other words, the false statement or the omission must be shown to be material to the ultimate decision to

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 9

issue the search warrant. Failure to make a showing as to either element dooms a party's hearing request.

In the event that a hearing is granted and "at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side [or the omitted material included], the affidavit's . . . content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.

Generally speaking, an allegation is made with "reckless disregard for the truth" if the affiant "in fact entertained serious doubts as to the truth of the allegations or where circumstances evinced obvious reasons to doubt the veracity of the allegations in the application." *Burke v. Town of Walpole,* 405 F.3d 66, 81 (1st Cir. 2005) (quoting *United States v. Ranney,* 298 F.3d 74, 78 (1st Cir. 2002)) (internal quotation marks omitted). "In the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." *Town of Walpole,* at 81–82 (internal quotation marks omitted).

2.    Facts alleged by Agent Ríos in the affidavit in support of probable cause for the issuance of the Warrant

On August 4, 2022, Agent Ríos submitted an application for the Warrant seeking authorization to search the defendant's residence on 4th Street in the Villa Angelina community and his white Hyundai Elantra. Docket No. 88 at 95. In support of the Warrant, Agent Ríos drafted an affidavit (the "Affidavit") and presented it for review by the Honorable Geisa M. Marrero Martínez, a Puerto Rico Municipal Court Judge assigned to the Fajardo Region. *See* Docket Nos. 239-1 at 12-19. The verbatim text of the Affidavit describing the investigation conducted by Agent Ríos provided as follows:

> On Friday, July 29, 2022, I started my shift in the morning hours to continue collecting intelligence regarding various murders that occurred in the town of Luquillo for the

control of drug points. During the afternoon, I received information through an anonymous tip which stated that in the town of Luquillo, Villa Angelina community, near the [basketball] court area, lives an individual known as "Coquí." This tall, skinny, brown skinned individual of approximately 30 years of age goes around in a white Hyundai Elantra vehicle with license plate HOA003. He is part of a criminal organization that operates in the town of Luquillo, transporting controlled substances in his vehicle around the rural area. He carries a black pistol-type firearm in an illegal manner. I proceeded to inform Sgt. Luis O. Fred Carrillo, badge 8-14054, Director of the Homicide Division in the area of Fajardo. The sergeant instructed me to investigate this information next week.

On Tuesday, August 2, 2022, I started my shift at 6:00 a.m. I proceeded to take a confidential vehicle property of the Puerto Rico Police [and] depart toward the town of Luquillo in civilian clothes to investigate the information received. At around 6:15 a.m., I located the white Hyundai Elantra vehicle, license plate HOA003, parked in front of a residence in Calle 4 near the [basketball] court of the Villa Angelina community. I proceeded to place myself in a spot where I had visibility of the vehicle and the residence where it was parked at. This residence was closed. At around 8:40 a.m., I left the place. There was no movement from the vehicle or residence under investigation. At around 11:50 a.m., I passed by Calle 4 in Villa Angelina. I observed an individual with the same descriptions [given] by the anonymous tip in the balcony area. He was smoking a cigarette, no sweater, short blue pants, and carrying a black firearm on his waist. I was able to identify this individual as Alexis Vidal Collazo[,] a.k.a. "Coquí." I have intervened with him [o]n various occasion[s]. When I observed this, I continued [on] my way and left the place for [my] safety. During the day, I stayed in different areas of the town of Luquillo investigating part of this organization. At around 4pm, I went on road 983 of the rural area towards the cemetery at barrio Pitahaya in Luquillo near kilometer [illegible] and observed a white Hyundai Elantra vehicle parked on the road and an individual standing near the car. When approaching, I could see Alexis Vidal Collazo A.K.A. "Coquí" wearing a white Jordan sweater, short black and red pants, and

Jordan sneakers. While passing him by [i]n my confidential vehicle, he walked towards the driver's side of his Hyundai vehicle. I observed he had on his back waist a black firearm with a red marking. He got into the vehicle of which I was able to verify the license plate. It was the same vehicle I saw at the community: a white Hyundai Elantra license plate HOA-003. He continued on his way when turning to follow up. I lost sight of him on road 992. Then, I proceeded to notify Sergeant Luis O. Fred Carrillo to informed [sic] what happened and the result of the investigation. Sgt. Carrillo instructed me to request a search order [sic] as a result of the investigation.

Government Exhibit 4A, Docket No. 239-1 at 12-13.

The Judge indicated in the Warrant that at the conclusion of Agent Ríos' application for the Warrant, he specifically requested the following:

That, based on my experience as an Officer for the Puerto Rico Police, I consider that the RESIDENCE DESCRIBED ABOVED as well as the white Hyundai Elantra, with license plate HOA-003, are being used to store firearms. Therefore, I respectfully request from the Court that if probable cause is found to issue a search order, *be it day or night*, for said residence and vehicle to seize all evidence that is in violation of the Weapons Act and any other against the Law. I testify that from the investigation and analysis conducted it can be concluded that the residence and the vehicle to be searched are being used to transport and store firearms and/or any other thing against the law. Therefore, I state that there is reason to determine the possibility of a violation against the Weapons Act.

Government Exhibit 4A, Docket No. 239-1 at 17. (Emphasis added.)

Having reviewed the Application submitted by Agent Ríos, at 2:45PM Judge Marrero Martínez took his oath and authorized the search of both the residence and the vehicle.[7] In the Warrant, however, Judge Marrero clarified that "This Order shall be served and duly returned completed within ten (10) days from

---

[7] Because no evidence was found inside the vehicle, the search warrant for defendant's car is not being challenged in the Motion to Suppress.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 12

the date of issuance and shall *only be served within hours of the day,* unless a magistrate, for compelling reasons, shall order it to be carried out at any time of the day or night." *See* Docket 239-1 at 17. (Emphasis added.)

   3.   Agent Ríos' live testimony given during the evidentiary hearing

      i.   *The anonymous tip received by Agent Ríos on July 29, 2022*

The Government called as its first witness PRPB Agent Luis G. Ríos Camacho, who testified about his copious work experience as a PRPB Officer. He explained that he had been a PRPB Officer for the past 13 years and that at the time of this investigation, he had been working as an Investigative Agent with the Homicide Investigation Unit in the Fajardo Area. *See* Docket No. 88 at 28. He was also assigned at that time to work in the Gender Violence Division acting as a liaison between the PRPB and the specialized courtroom in the Fajardo courthouse dealing with gender violence. *Id.* at 29. Previously, upon graduating from the Puerto Rico Police Academy, he was assigned to work with the Luquillo Division as a uniformed State Police Officer. In 2011, he was transferred to the Drugs and Narcotics Division in Fajardo, Puerto Rico. While working with the Drugs and Narcotics Division, he was assigned to the Division of Surveillances and Searches. Throughout his career, Agent Ríos estimated having drafted approximately 30-40 applications for search warrants and having participated in approximately 100 surveillances. *Id.* at 31.

During the evidentiary hearing, Agent Ríos testified on direct examination fairly consistent with the facts set forth in the Affidavit in support of the application for the Warrant, though upon questioning from the Government, he naturally added some significant details. To that effect, he indicated that on July 29, 2022, during the afternoon hours, while working as an Investigative Agent with the PRPB Homicide Investigation Unit, Fajardo Area, he was transferred a phone call. Agent Ríos testified that in that call he received a tip from a woman, though he insisted that the female caller did not identify herself. Docket No. 46-1 at 6 of 9.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 13

ii.     *The surveillance conducted on August 2, 2022*

Agent Ríos testified that he then notified his supervisor, Sergeant Luis O. Fred-Carrillo, who instructed him to open an investigation the following week. *Id.*[8] He further explained that pursuant to those instructions, on Tuesday, August 2, 2022, he arrived on duty at approximately 6:00AM and proceeded to the Villa Angelina community to conduct surveillance where he was already situated by 6:15AM. Docket No. 88 at 37. After locating the defendant's white Hyundai Elantra, which was parked in front of defendant's residence on 4th Street, he moved to a secure location sufficiently far away from the residence for him to stay out of sight, yet close enough to still see both the defendant's house and car. *Id.* at 38.

Agent Ríos also indicated that at approximately 7:30AM he took a video of the defendant's house from that vantage point using a pair of binoculars that he had recently purchased for use with his cellphone.[9] *Id.* at 41 (*see* Government Exhibit 1 (a physical CD containing the video was admitted into evidence)). The video showed a relatively distant but clear view of the front of the defendant's house and of the parked white Hyundai Elantra. *Id.* The video did not show the defendant, nor did it depict any criminal activity underway. At approximately 8:40AM, Agent Ríos withdrew from the location after witnessing no activity at the residence. *See* Docket No. 88 at 44.

Pursuant to his testimony, Agent Ríos explained that, a few hours later, at approximately 11:50AM, he returned to the defendant's house to continue his surveillance. *Id.* at 44-47. This time, though, rather than take up a position far from the defendant's house, Agent Ríos drove slowly past the defendant's house[10] where he claimed to see the defendant, whom he knew to go by the nickname "Coqui," sitting

---

[8] Sgt. Luis O. Fred-Castillo was not called to testify during the evidentiary hearing and therefore did not independently corroborate any of Agent Ríos' testimony.

[9] A date and time stamp on the video indicated that the video was taken on August 2, 2022 at 7:30AM.

[10] The defendant's house is on a significant incline so that as Agent Ríos passed by the house, he was driving downhill with the house to the right side of his car.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 14

on the front porch smoking a cigarette. *Id.* The defendant was shirtless and was wearing a pair of "blue sports pants." *Id.* Agent Ríos said that as he drove by the house, the defendant happened to stand up, and this allowed Agent Ríos to see a black firearm tucked into the right side of defendant's waistband. *Id.* Agent Ríos testified that after seeing the defendant with the black firearm in his waistband he immediately left the area for his own safety, not to return to the house for the rest of the day. *Id.* at 47. *See also* Docket No. 89 at 196.

Agent Ríos further testified that later that afternoon, at approximately 4:00PM, he happened upon the defendant while driving along Road No. 983, Kilometer 3.3, in the Pitaya Ward of Luquillo, Puerto Rico. Agent Ríos explained that while driving along Road No. 983, purportedly to investigate other matters in the area (*see* Docket No. 192 at 186), he came upon the defendant's white Hyundai Elantra parked along the side of the road "in the countryside." *Id.* at 48. The defendant's car was facing in the opposite direction from the direction Agent Ríos was travelling and was taking up practically the entire lane. *Id.* at 49. For that reason, Agent Ríos said he had to pass by defendant's vehicle very slowly in his unmarked car. *Id.* As he passed by the defendant's car, he could see the defendant walk from behind the back of the Hyundai Elantra past the driver's side door while wearing "red and black shorts, a white T-shirt and Jordan tennis shoes." *Id.* Agent Ríos said that as the defendant walked to the front of the Hyundai Elantra, he could see "a black firearm with some red details" "in the back-right part of [defendant's] body." *Id.* Agent Ríos explained that he was able to see the firearm because he was "very close, like five, not more than ten feet, like five feet," away from the defendant at the time. *Id.*[11] After seeing the defendant with the firearm "with red

---

[11] In response to the question from the prosecutor, "How were you able to see the firearm?" Agent Ríos responded by saying, "Well, since the vehicle was on my left, he was then–Alexis Vidal was on the right and I could see that he had the firearm coming out from his pants and coming out of his sweater area or shirt." Docket No. 88 at 49-50.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 15

details" in his waistband, Agent Ríos followed the defendant but lost sight of him on Road 922 in Luquillo. *Id.* at 51.

Agent Ríos further testified that after losing sight of the defendant's car, he informed Sergeant Fred-Carrillo that he had seen the defendant carrying a weapon at his home and in the countryside, whereupon Sergeant Fred-Carrillo instructed Agent Ríos to seek a search warrant of defendant's home and vehicle. *Id.* at 51. Importantly, though, Agent Ríos testified that he conducted both purported surveillances alone and that he did not take any photos or videos depicting the defendant actually possessing a firearm. Accordingly, by his own admission, the only evidence to support his observations is "his testimony." *See* Docket No. 88 at 104 and 110.

### iii. *Agent Ríos' return to defendant's house on August 3, 2022*

Given Sergeant Fred-Carrillo's marching orders, Agent Ríos returned to the defendant's house on August 3, 2022, to confirm certain information that he would need to complete the application for the Warrant, namely the color of defendant's house and its boundary lines, as well as a description of the adjacent properties. *Id.* at 57. To assist in preparing the application for the Warrant, Agent Ríos took a video driving down the same road in front of the defendant's house that he purportedly drove down the day before when he claimed to see the defendant smoking on the front porch with the black firearm in his waistband. *See* Government Exhibit 3 (a physical CD containing the video was admitted into evidence). The August 3, 2022 video did not show the defendant, nor did it depict any criminal activity. Using the information gathered during his pass-by on August 3, 2022, Agent Ríos drafted the Affidavit and submitted it together with an application for the Warrant on August 4, 2022.

iv.    *Impeachment/Cross Examination of Agent Ríos*

a) *Agent Ríos' cagy, selective, and non-committal testimony, and his overall reluctance to admit to key facts, including having communicated in real-time with the defendant's then girlfriend, Viviannette Rivera, during the investigation severely undermined his credibility.*

Contrary to his calm, cool and collected manner of testifying on direct examination, Agent Ríos was cagy, non-committal and contradictory on cross examination. Indeed, in response to questioning by Counsel for the defendant, Agent Ríos was forced to expand on the cursory facts contained in his Affidavit and to admit to additional facts that compromised his credibility with the Court.

To start, Agent Ríos reluctantly admitted that he knew a woman by the name of Viviannette Rivera, who was the defendant's girlfriend at the time of the investigation. More specifically, in response to a question from Counsel regarding whether he knew defendant's girlfriend to be Viviannette Rivera, Agent Ríos reluctantly responded that, "[t]he last name I wouldn't be able to tell you but the name, yes." Docket No. 88 at 80.[12]

He also attempted to conceal the fact that he had discussed the salient facts of his investigation with Viviannette Rivera. For example, when Counsel asked Agent Ríos whether the day after receiving the confidential tip he proactively called Viviannette Rivera to follow up on this investigation, Agent Ríos initially equivocated by stating, "It's just that I don't remember . . ." Docket 88 at 83 & 84. But, after having his recollection refreshed with telephone toll records for July 30, 2022, Agent Ríos was forced to acknowledge that he *might have* called her on July 30th because

---

[12] When asked if Viviannette Rivera was, in fact, the tipster who provided the telephonic confidential information on July 29, 2022, Agent Ríos stated that he did not know the identity of the woman who placed that call. *Id.* A little later in his testimony, however, Agent Ríos unequivocally affirmed that, as far as he knew, Viviannette Rivera was *not* the caller who provided the confidential tip on July 29, 2022. *Id.* at 82. The defendant contends in his Motion to Suppress that there really was no anonymous tipster and that Agent Ríos simply used information that he had received from Viviannette Rivera to claim there was a tipster. Defendant's contention is not so far fetched.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 17

"[t]he call appears to be Viviannette's number" and that the conversation might have been related to the investigation. *Id.* at 89.

When Counsel asked if the call on July 30th "was in relation to your investigation of this case," Agent Ríos initially responded, "[n]ot necessarily." *Id*. But when Counsel pressed Agent Ríos to explain whether he had a personal relationship with Viviannette Rivera, he once again equivocated before admitting that he *might have* discussed his investigation with her. In response to this inquiry, the following exchanged ensued:

> **Agent Ríos**:    Well, I can explain. I'm a Pastor and I receive calls. I have calls from many people, so and they ask me questions, so on one occasion, no –
>
> **Counsel**:    So, you happen to have a religious relationship with a congregant of your church whose boyfriend you're investigating criminally.
>
> **Agent Ríos**:    *No*, I mean, all people who call me who have any kind of need, as a Pastor, I'm going to provide the service.
>
> **Counsel**:    So, is it your testimony that when you spoke to Ms. Viviannette on July 30th, 2022, the day after you received a tip about a person named Coqui, you did not speak at all about Alexis Vidal Collazo, her boyfriend?
>
> **Agent Ríos**:    Well, it's just that *I wouldn't be able to tell you* the exact date because *sometimes I spoke to her as a counselor and other times as a member of the police.*
>
> **Counsel**:    So, is it fair to say that it's possible that you did speak to Viviannette about Mr. Vidal and his being involved in criminal activity?
>
> **Agent Ríos**:    *It's possible.*

Docket No. 88 at 89-90. (Emphasis added).

Agent Ríos' vagueness and lack of memory was proven to be a sham by the record developed at the hearing. The admission into evidence of a thread of WhatsApp text messages (the "Chat") exchanged between Agent Ríos and Viviannette Rivera proved by a preponderance of the evidence that Agent Ríos indeed used Viviannette as a confidential informant in this investigation and that he discussed with her

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 18

intimate details of the investigation from July 29, 2022 through at least August 2, 2022.[13] *See* Exhibit 21, Docket No. 184-1. A careful review of the Chat reveals that Agent Ríos was in continuous communication with Viviannett Rivera from July 29, 2022 through August 2, 2022, both through the Chat and through telephone calls.[14]

Agent Ríos, however, concealed his communications with Viviannette Rivera from the local court judge who authorized the Warrant, from the federal prosecutors, and from this Court. He did not mention the use of a confidential informant as part of his investigation in the Affidavit, and when asked whether it was true that none of the files given to the federal prosecutors mentioned in any way Viviannette Rivera, Agent Ríos responded, "[t]hat is correct." *See* Docket No. 89 at 167. He also attempted to deny Viviannette Rivera's role as a real-time informant during the hearing because he claimed that she was not "paid by the Puerto Rico Police to provide information." *See* Docket 192 at 87, 152. He nevertheless begrudgingly admitted that Viviannette Rivera was a "person that [was] provid[ing] information and corroborat[ing] the investigation [he was] conducting." *See* Docket 89 at 166.

The Court's review of the Chat also leads to the reasonable conclusion that Viviannette Rivera provided *all* the important and salient facts that ultimately appeared in Agent Ríos' Affidavit in support of the application for the Warrant. First, Viviannette told Agent Ríos on July 29 that the defendant kept a black gun underneath the "carpet of [his] car" and "in the passenger seat."[15] Docket 184-1 at 8

---

[13] The WhatsApp chat conversation between Agent Ríos and Viviannette Rivera spanned from July 9, 2022 through May 24, 2023. *See* Government Exhibit 21, Docket No. 184-1.

[14] Agent Ríos' toll records were entered into evidence as Defense Exhibit N. *See* Docket No. 211 at 75, lines 22-23. The toll records indicate there were five calls between Agent Ríos' and Viviannette Rivera's telephone numbers on July 30, August 2, and August 5, 2022. *Id.* at 76-78. The Chat also showed that Agent Ríos and Viviannette Rivera were in continuous communication via text message during the time that Agent Ríos alleged that he was conducting his investigation, specifically from July 29, 2022 through August 2, 2022. *See* Docket 184-1 at 8-46. The Chat itself confirms that Agent Ríos and Viviannette Rivera were also communicating by telephone when at 10:47:10AM on August 2, 2022, he texted "Ok, I'll call you in a little while." *See* Docket 184-1 at 31.

[15] The Court notes that Agent Ríos' contention that the individual referenced in the Chat is some unnamed individual who is suspected of wanting to kill Viviannette's son is simply implausible

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 19

and 12. These statements coincide with the details provided by the alleged anonymous tipster mentioned in the Affidavit, namely that "[h]e is part of a criminal organization that operates in the town of Luquillo, *transporting controlled substances in his vehicle* around the rural area. He c*arries a black pistol-type firearm* in an illegal manner." Government Exhibit 4A, Docket No. 239-1 at 12 (emphasis added).

Second, on August 1, 2022, the day *before* the surveillance, Viviannette Rivera sent Agent Ríos a photograph of a customized black firearm with "a red marking" through the Chat.[16] Docket 184-1 at 16. This detail coincides with the allegation in the Affidavit that the following day, on August 2, 2022, Agent Ríos saw the defendant on Puerto Rico Road 983 carrying "on his back waist a black firearm with a red marking."[17] Government Exhibit 4A, Docket No. 239-1 at 13.

Third, Agent Ríos asked Viviannette Rivera on August 2, 2022, at 7:50AM whether the defendant "smokes cigarettes," to which she responded, "Yes." Docket No. 184-1 at 22-23. This fact coincides with the allegation in the Affidavit that Agent Ríos claims to have seen the defendant some three hours later, at 11:50 AM, smoking on the front porch of his residence and carrying a "black firearm on his waist." Government Exhibit 4A, Docket No. 239-1 at 13.

And fourth, on August 2, 2022 at 4:23:25PM, while Agent Ríos claimed to be in the countryside merely by chance, he texted Viviannette Rivera to ask "[w]hat is he [the defendant] wearing?" Docket 184-1 at 45. To which Viviannette Rivera responded "[a] white Jordan T-shirt. Black and red basketball shorts and his Jordan sneakers."

---

and unbelievable. Instead, the Court finds that the statement that "he keeps it in the carpet of the car;" that "I was with him a few days just to let you know;" that "[h]e swapped the black one with the custom one;" and that he keeps it in the "passenger seat," all refer to the defendant and not someone trying to kill Viviannette's son.

[16] The red marking on the firearm was the number "23" painted on the slide of the left side of the firearm. The number "23" is well-known for being basketball legend Michael Jordan's jersey number when he played for the Chicago Bulls.

[17] Given the location of the "red marking" on the slide of the weapon, it is doubtful whether the red marking could even be seen if it were tucked into someone's waistband while also wearing a shirt. But that detail was not presented by the Government during the hearing. It is merely the Court's observation.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 20

Docket 184-1 at 45. Agent Ríos, meanwhile, used a nearly verbatim description of what the defendant was wearing in the Affidavit. Agent Ríos stated in the Affidavit that "[a]t around 4:00PM, I went on Road 983 of the rural . . . and observed a white Hyundai Elantra vehicle parked on the road and an individual standing near the car. When approaching, I could see Alexis Vidal Collazo A.K.A. "Coquí" wearing *a white Jordan sweater, short black and red pants, and Jordan sneakers.*" Government Exhibit 4A, Docket No. 239-1 at 13. The curious thing about this description is that Agent Ríos asked Viviannette what the defendant was wearing some 20 minutes *after* he claimed to have seen him parked along the side of the road in the countryside carrying the *firearm with a red marking*. Based on the Chat, Viviannette would have known what the defendant was wearing that day because at 3:24:03PM, she told Agent Ríos that she had "passed by the [defendant's] house and he [was] there with [her] kid." Docket 184-1, at 42.

Agent Ríos, on the other hand, would not have needed to ask Viviannette what he was wearing if he had in fact seen him 20 minutes earlier. In addition, Agent Ríos would not have had to ask what he was wearing because he should have recognized him at first sight given the fact that he admitted to having approximately 6 or more previous interactions with the defendant and having personally arrested him in separate 2020 case. Docket No. 88 at 71-72.

Agent Ríos' equivocation and selective memory as to his knowledge and recollection of his conversations with Viviannette Rivera on or around August 2, 2022, evidence the fact that he was concealing the true nature of his relationship with her. Indeed, his recalcitrant adhesion to this deception during the hearing revealed that the overall motive for hiding the existence of Viviannette from the municipal court judge, the federal prosecutors, and this Court, was to hide the fact that 1) Agent Ríos did not independently corroborate the information provided by Viviannette Rivera, and 2) he did not actually see the defendant carrying a firearm at 11:50AM, nor at 4:00PM, on August 2, 2022.

b) *The record does not support a finding that Agent Ríos saw the defendant carrying a firearm on two separate occasions on August 2, 2022.*

Agent Ríos testified, and wants the Court to believe, that "[i]n this case [he] filed and requested the Warrant because of what [he] saw, not because of information that [he] received." Docket No. 192 at 151, lines 22-23. Through his testimony, he claims to have seen the defendant carrying a firearm on two occasions on August 2, 2022, while he conducted his investigation—once at 11:50AM on defendant's front porch and then again at 4:00PM on PR Road 983—but the exchange between him and Viviannette Rivera in the Chat conveys a very different turn of events.

Agent Ríos testified during the hearing, and swore-out in his Affidavit that he first visited defendant's residence at 4th Street in Villa Angelina on August 2, 2022 from 6:15 through 8:40 AM, during which time he did not see the defendant, nor did he see any activity at his home. Docket No. 88 at 44. For that reason, he left the area. During that same period of time, he did, however, engage Viviannette Rivera in a text conversation pursuant to which he procured details about the defendant's personal habits, like when he woke up in the mornings, whether he smoked, and other details about his residence. *See* Exhibit 21, Docket 184-1 at 20-30.

Agent Ríos explained during his direct testimony that at 11:50AM on August 2, 2022, after he saw the defendant on his front porch carrying a firearm in his waistband, he immediately left the Villa Angelina area for his safety, not to return that day because he already had the probable cause needed for a warrant. *See* Docket No. 88 at 47, lines 9-18. The evidence presented during the hearing does not corroborate that statement.

Despite claiming that by 11:50AM on August 2, 2022, he had personally observed conduct sufficient to procure a search warrant, a careful review of Agent Ríos' Chat conversations with Viviannette shows, by a preponderance of the evidence, that between 10:47 AM and 3:57 PM Agent Ríos had been unable to see the defendant at Villa Angelina.

As indicated before, at 7:50AM Agent Ríos inquired from Viviannette Rivera through the Chat whether the defendant smokes. Exhibit 21, Docket 184-1 at 22. Because Viviannette Rivera confirmed that he indeed does, Agent Ríos alleged both in the Affidavit and during the hearing that when he drove by the residence at 11:50AM he saw the defendant smoking in the front porch and carrying a black weapon. During cross examination, however, Agent Ríos was cagy, vague and unable or unwilling to explain why he had returned to the residence at 11:50AM.

When asked by Counsel if it was his "independent decision" "to go back to the [defendant's] home at 11:50AM," Agent Ríos responded by simply saying, it was "[p]art of my investigation." *See* Docket No. 88 at 98. Counsel then followed up by asking him, "[s]o nobody told you to go back to the home at 11:50?" To which Agent Ríos again pithily responded, "[p]art of the investigation." Counsel for the defendant then quipped back by asking, "[a]n informant didn't tell you to go back at 11:50 a.m." Whereupon, Agent Ríos irksomely explained that "[a]ll the information that I receive in the investigation, that's what I use to decide if it's necessary to go back to the location." *Id.* This exchange between Counsel and Agent Ríos regarding his purported reason for returning to the defendant's home around 11:50AM ended with Agent Ríos finally explaining that, "[i]nformation is received from several sources in this investigation and it's because of that [ ] then in the investigation I decide to go back to the house. *It wasn't that I received that information, that a confidential source, an informant, told me go back to the house at this time.*" *See* Docket 88 at 98-99. (Emphasis added).

But Agent Ríos' equivocation and his final explanation of why he claims to have returned to defendant's house at 11:50AM rings hollow. It was shown through toll records that at 11:41 AM on that day, 10 minutes before the alleged sighting of the defendant with a firearm, Agent Ríos had an approximately four-minute-long telephone conversation with Viviannette Rivera. *See* Docket 211, at 76, lines 14-24; Exhibit N, Docket No. 240-2 at 3, line 119. He also continued a conversation via text with Viviannette Rivera that demonstrates that he had been unsuccessful in his

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 23

attempts to see the defendant during his surveillances of the residence. Indeed, as late as 2:25PM, Agent Ríos asked Viviannette through the Chat "[w]hat can we do to see him go?" *See* Exhibit 21, Docket No. 184-1 at 40. He also indicated to Viviannette Rivera at 3:57PM that "I'm not going to get any closer[,] so he doesn't notice." *Id.* at 43.

Furthermore, the Chat communications are also wholly inconsistent with the allegation that Agent Ríos happened upon the defendant by chance at Road 983 a little after 4:00PM. During cross examination, when Counsel confronted Agent Ríos with the inconsistency between his expressed desire not to get close to the defendant because the defendant could recognize him and the allegation that Agent Ríos was able to see the firearm with the red marking in the defendant's waistband at Road 983 because he was "five to ten feet away from him," Agent Ríos responded that "I didn't know he was there." *See* Docket 192 at 193, lines 14-20. The Chat reveals that statement to be inaccurate. Exhibit 21 shows that at 4:09PM, Viviannette Rivera informed Agent Ríos via text communication that the defendant left his home in Villa Angelina and headed to the countryside, towards an area of Sabana called "Casa Blanca," known by Agent Ríos to be an area where the defendant "and other members of the organization used to move firearms and controlled substances." Exhibit 21, Docket No. 184-1, at 43-44; Docket No. 192, at 106, lines 4-6 and at 110, lines 6-12. Agent Ríos also testified that it would take only five minutes to drive from the defendant's residence to the location on Road 983 in Sabana where the defendant was purportedly seen next to his parked white Hyundai Elantra. Docket No. 88 at 48, lines 3-8. Therefore, according to the real-time Chat, the time Agent Ríos could have allegedly seen the defendant at Road 983, which in reality would have been sometime between 4:15 and 4:23PM on August 2, he would have been fully expecting to run into him in that area.

This misrepresentation, combined with Agent Ríos' inquiry to Viviannette Rivera at 4:23PM about "what is [the defendant] wearing?" leads to the reasonable conclusion that Agent Ríos did not, as a matter of fact, actually see the

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 24

defendant at Road 983 at around 4:00PM. Exhibit 21, Docket 184-1 at 45. After all, Agent Ríos admitted to having had over half a dozen prior interactions with the defendant before August 2, 2022, and to having arrested him in a separate case in 2020. *See* Docket 88 at 71; Docket 192 at 195. He also saw the defendant's Hyundai Elantra at the defendant's residence that morning and was familiar with the license plate number. Furthermore, he expected to see the defendant near Casa Blanca because Viviannette Rivera told him through the text communication of 4:09PM that the defendant was headed in that direction. Simply put, there was no practical reason for Agent Ríos to ask about what clothes the defendant was wearing if he had in fact managed to see the defendant sometime before 4:23PM, as he claims in the Chat. Exhibit 21, Docket 184-1 at 45-46.

Based on the totality of the record, the Court finds that Agent Ríos did not actually witness the defendant carrying a firearm on the two separate occasions on August 2, 2022, as alleged in the Affidavit. The Court's interpretation of the evidence and the record reveal that the allegations mentioned in the Affidavit regarding Agent Ríos having seen the defendant on his front porch and in the countryside on August 2, 2022, carrying two different firearms are fabrications based on the information provided by Viviannette Rivera during the real-time text and telephone communications she had with Agent Ríos on August 2, 2022.

The Court empathizes with Agent Ríos' desire to protect the identity of a confidential informant, even more when that informant is providing relevant evidence against an alleged enforcer in a violent drug trafficking organization. These concerns, however, no matter how legitimate, do not justify the concealment of the existence and use of a confidential informant from the prosecution, the defense and the Court. A police officer can validly conduct an investigation based on information provided by a confidential informant, *and* keep their identity anonymous by conducting independent surveillance and an independent investigation to corroborate

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 25

the information provided by the informant.[18] The record in this case, however, does not support a finding that Agent Ríos conducted the required independent surveillance or independent investigation required to corroborate the information provided by Viviannette Rivera.

Agent Ríos was an evasive and reluctant witness regarding his surveillance on August 2, 2022, and his demeanor leads this Court to conclude that his alleged memory lapses were feigned. These misrepresentations also appear to be motived, not solely by a concern for the confidential informant's safety, but rather by a desire to conceal the true nature and source of the information included in the Affidavit. Based on Agent Ríos' poor recall of events, equivocation and multiple claims of memory loss, the Court finds his testimony claiming to see the defendant on two separate occasions, first at 11:50AM on his front porch and second at 4:00PM in the countryside on August 2, 2022, carrying illegal firearms, simply unbelievable.

Therefore, when Agent Ríos swore out the Affidavit before Judge Marrero Martínez claiming to have seen the defendant carrying an illegal firearm on two separate occasions on August 2, 2022, the Court finds by a preponderance of the evidence that Agent Ríos (1) knowingly and intentionally included a false statement in the Affidavit; and (2) that that false statement was material to the finding of probable cause. *See Id*. at 155–56; *Hicks*, 575 F.3d at 138; *United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002). Accordingly, having found that "the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, the Court sets aside the false and fraudulent material, namely the two sightings of the defendant possessing a firearm on August 2, 2022. After doing so, the

---

[18] The identities of confidential informants can also be kept secret more easily at the motion to suppress stage than at the trial stage. This is so because the Supreme Court has never determined that due process requires disclosure of an informant's identity at a suppression hearing; rather, the defendant's interest in disclosure at the suppression stage is less than at trial. *United States v. Jackson*, 918 F.2d 236 (1st Cir. 1990); *See also United States v. Raddatz*, 447 U.S. 667, 679 (1980). ("[A]lthough the Due Process Clause has been held to require the Government to disclose the identity of an informant at trial, provided the identity is shown to be relevant and helpful to the defense, *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957), it has never been held to require the disclosure of an informant's identity at a suppression hearing.").

---

Court finds that the remaining content of the Affidavit is insufficient to establish probable cause for the search of the defendant's home or his vehicle. As a result, the search warrant for defendant's residence must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. *Franks*, 438 U.S. at 156. Here, the fruits of the search subject to suppression would include defendant's incriminating statements made during his custodial interview with ATF agents.

### B. *The defendant's challenge to the nighttime search*

The defendant next contends that the PRPB agents who executed the Warrant acted outside of judicial authorization by executing the Warrant during the nighttime hours, namely at 4:57AM, after the state municipal court judge specifically ordered the search to be conducted "only . . . during the daytime hours." The defendant avers that this violation should trigger a *per se* suppression of the evidence. Defendant further claims that even if the Court were to find that that conduct does not trigger a *per se* violation, the record nevertheless demonstrates that the pre-dawn execution of the Warrant resulted in prejudicial error because the search would have been significantly less abrasive had it been executed during the daytime hours.

### 1. Facts surrounding the August 5, 2022 execution of the Warrant

The Warrant in this case was sworn by a PRPB Agent (Agent Ríos) based on an investigation that he alone conducted. A Puerto Rico municipal court judge authorized the Warrant and state law enforcement officers executed it. Moreover, the Warrant was sworn and executed pursuant to Puerto Rico Rule of Criminal Procedure 231, which establishes that a search warrant must indicate that its execution will be during the day, unless the judge, after considering factors of need and urgency, authorizes execution at night. 34 P. R. Laws Ann. Ap. II, § 231. *See also,* Docket No. 40-1 at 11. The Warrant was also executed consistent with PRPB General Order 612, which reads in pertinent part that,

> [t[he Warrant will specify whether it is to be executed by
> day or by night. Service at night must be for reasons of
> pressing urgency. If the Warrant specifies that it must be

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 27

> executed at night, the PRPB officer must show that there
> is a reasonable probability that the evidence to be seized or
> the person to be searched is at the place, or that the
> evidence might be removed, concealed, or destroyed before
> daybreak, or that the police operation would be safer or
> more successful.

PRPB General Rule 612 at Section (III)(B)(c), *see* Docket No. 30-7 at 8.[19] The record
further indicates that the participation of the federal agents came well after the
procurement and execution of the Warrant.

Once the state municipal court judge authorized the Warrant, Agent Ríos
turned over responsibility and control for the execution of the Warrant to Agent Díaz.
*See* Docket No. 191 at 23. Agent Díaz is a thirty-year veteran of the PRPB who has
worked in the Bayamón, Carolina and Río Grande Divisions. *Id.* at 21-22. He was also
assigned to work in FURA, which is an acronym that stands for "Fuerzas Unidas de
Rapida Acción," in Spanish, or Joint Forces of Rapid Action in English.[20] After leaving
FURA, Agent Díaz was assigned to the Criminal Intelligence Division, the Homicide
Division, and the Domestic Violence Division. *Id.* at 22. He has participated in more
than fifty (50) searches over the years. *Id.* at 23.

On August 5, 2022, at approximately 4:50AM, the search team, comprised of
members of the PRPB SWAT Team, arrived at the defendant's home in the
Villa Angelina community to execute the Warrant. Docket No. 191 at 28-30.
Agent Díaz testified that the SWAT Team is often used, as it was in this case, when
the person whose home is going to be searched is particularly dangerous.[21] *Id.* at 30.
At 4:57AM, the Bayamón SWAT Team of the PRPB threw one or more flash bang

---

[19] These requirements are like those in Rule 41(e) of the Federal Rules of Criminal Procedure;
that a search warrant is to be executed during daytime "unless the judge for good cause expressly
authorizes execution at another time." Fed.R.Crim.P. 41(e)(2)(A)(ii). "Daytime" means the hours
between 6:00 a.m. and 10:00 p.m. Fed.R.Crim.P. 41(2)(B).

[20] FURA is an agency within the PRPB that coordinates special operations between the state
and federal agencies.

[21] Agent Díaz testified that the defendant was known to belong to the organization responsible
for multiple murders in the greater Fajardo area. Docket No. 191 at 58.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 28

grenades into the home and entered. *Id.* at 28. The defendant and his father, José Manuel Vidal Velázquez ("Mr. Vidal") were inside the home at the time of entry.[22] *See* Exhibits 9 & 9A. Mr. Vidal was described as an elderly man, calm and passive who appeared to have just woken up. *See* Docket No. 191 at 33 and 66. Mr. Vidal was barefoot and shirtless and was wearing only a pair of drawstring sport shorts.[23] *See* Exhibits 10 & 11. The defendant, on the other hand, was nervous and wasn't following commands. *See* Docket No. 191 at 33. Before the search began, the defendant stated that his father wasn't responsible for anything that was found; that he, instead, was responsible for it. *Id.* at 34. At that moment, Agent Díaz interrupted the defendant to read him his *Miranda* rights, which Agent Díaz said he appeared to understand because he remained silent after having his rights read to him. *Id.*

After the SWAT members entered the home and secured the premises, personnel from Technical Services went in and took pictures. A K-9 unit then conducted a quick sweep around the house. *Id.* at 35. Once these tasks were completed, at approximately 5:22AM, Agent Díaz began the search for firearms. *See* Exhibit 9 & 9A (English translation).

Agent Díaz began the search like he always does, starting from the right side of the house. Docket No. 191 at 35. When he reached the defendant's bedroom, the defendant interrupted him and said that what he was looking for was outside in his vehicle. *Id.* Agent Díaz then paused his search of the defendant's room and went to look in the car. *Id.* Nothing was found in the vehicle, so Agent Díaz returned to the defendant's bedroom. *Id.* at 36. Underneath the bed, Agent Díaz found a black bag with a drum magazine next to it. *Id.* Inside the black bag was a black firearm (Glock, Model 23, .40 caliber), four pistol magazines, three of which were different size extended magazines, and 110 rounds of .40 caliber ammunition. *See* Government Exhibits 12 &13, Docket No. 239-2 at 3 and 4. The magazine that was inserted in the

---

[22] The defendant's mother was not present that day as she was traveling outside of Puerto Rico.

[23] The record is unclear how the defendant was dressed that morning.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 29

pistol had the number "23" painted in red paint on the side.[24] In addition, on the center part of the drum magazine, there was an Air Jordan symbol[25] painted in red. *Id.* Agent Díaz also testified that there was an odor of someone having smoked in the room.[26] On the night stand, Agent Díaz found a box of matches and several lighters. *See* Exhibits 15 & 16, Docket No. 239-2 at 6 and 7; and Docket No. 191 at 39-40. The search concluded at approximately 7:00AM. Docket No. 191 at 29.

Once the search was completed, Agent Díaz explained that because the search was against the structure, everyone found on the premises was taken to the police station in Fajardo for questioning. *Id.* at 42. Though Mr. Vidal was not handcuffed during the entirety of the search of his house (*id.* at 68), PRPB agents did place him in handcuffs before putting him in the patrol car to be transported to the police station in compliance with standard procedures and because both he and the defendant were under arrest after an illegal weapon had been seized in the home.[27] *Id.* at 68, 76 and 77.

After the defendant and Mr. Vidal arrived at the police station, Agent Díaz read the defendant his *Miranda* rights *again*, only this time he used the official PRPB Advice of Rights Form. Docket No. 191 at 43. The defendant appeared to read the form and he, himself, checked the boxes at the top acknowledging each *Miranda* right that he has. *Id.* at 47. Agent Díaz asked the defendant if he understood his rights and he answered, "Yes." The defendant then filled out his name (*id.*) and checked the box

---

[24] To be clear, the firearm that was depicted in the photograph sent by Viviannette to Agent Ríos on August 1, 2022, that contained the red number "23" painted on the slide was *not* among the items seized in the defendant's residence on August 5, 2022.

[25] The "Air Jordan" symbol is the symbol used for the Michael Jordan sponsored basketball sneakers.

[26] Though the record is unclear as to what substance it purportedly smelled like, be it cigarettes, marijuana or something else, the obvious inference from the evidence however, is that it smelled like cigarette smoke. Notwithstanding that, however, Agent Díaz clarified on cross examination that no cigarettes, marijuana nor controlled substances were found during the search of the home. Docket No. 191 at 64.

[27] Agent Díaz testified that it is police protocol to handcuff all individuals who are being transported by patrol car. In this case in particular, both individuals were also under arrest.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 30

indicating that he "did not exercise his right to read them." *Id.* at 48. He then checked the box indicating that he understands his rights and that he waives them. *Id.* In the end, the defendant signed the bottom of the form in the space reserved for "Suspect's Signature," and his father signed as a witness, as did Agent Díaz and Agent Ríos. *Id.* at 50; *see also* Exhibits 17 & 17A, Docket No. 239-2 at 8-9. Agent Díaz said he was unaware that the defendant had difficulties understanding as he gave no indication that he was not understanding his *Miranda* rights. Docket No. 191 at 45. Agent Díaz said he did not communicate to ATF Special Agent Burgos that the defendant had any difficulties understanding because the defendant represented himself as a person that had the capacity to understand. *Id.* at 53.

### 2. The Fourth Amendment does not preclude nighttime searches

The Fourth Amendment prohibits "unreasonable searches and seizures." A search may be "unreasonable" depending on the manner and time in which it is conducted. *United States v. McCarty*, 475 F.3d 39, 43 (1st Cir. 2007). But, although the language of the Fourth Amendment explicitly sets out the requirements for a valid warrant, there is *no* specific provision on the time of day during which a warrant must be executed. *United States v. Gibbons*, 607 F.2d 1320, 1326 (10th Cir. 1979).[28] Accordingly, the First Circuit has found that "nighttime searches are not *per se* unreasonable" and has established that in addressing the constitutionality of a nighttime search conducted pursuant to a state-issued warrant, courts should apply a reasonableness test. *McCarty*, 475 F.3d at 43 (citing *United States v. Young*, 877 F.2d 1099, 1105 (1st Cir. 1989).

In *McCarty*, the First Circuit determined that a search that was authorized to be conducted between 7 a.m. and 9 p.m. but that started at 8:58 p.m., and continued through the night until 10:35 p.m., was reasonable. The First Circuit assessed the

---

[28] The Supreme Court has not resolved whether statutory restrictions pertaining to the time in which a warrant is executed have a basis in the reasonableness clause or the warrant clause of the Fourth Amendment. W.E. Ringel, 1 *Searches & Seizures, Arrests and Confessions* at § 6:5 (2d ed. 2020).

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 31

totality of the circumstances including "the scope of the particular intrusion, the manner in which it [wa]s conducted, the justification for initiating it, and the place in which it [wa]s conducted," to find the intrusion reasonable and affirmed the denial of the defendant's motion to suppress. *Id.*, 475 F.3d at 44 (citing *United States v. Cofield*, 391 F.3d 334, 336 (1st Cir. 2004)).

      3.  <u>Fed.R.Crim.P 41 does not establish a requirement of daytime searches for execution of state-issued warrants</u>

      Whether Fed.R.Crim.P. 41 applies to state-issued warrants is a question controlled by the First Circuit's decision in *United States v. Krawiec*, 627 F.2d 577 (1st Cir. 1980). In *Krawiec*, the First Circuit upheld the admission of evidence derived from a search conducted through a state-issued warrant over defendant's objection that the warrant violated Rule 41(b) because the supporting affidavit failed to indicate that there was probable cause to believe a federal (as opposed to only a state) crime had been committed. *United States v. Mitro,* 880 F.2d 1480, 1485-86 (1st Cir. 1989) (citing *Krawiec*, 627 F.2d at 580). The First Circuit reasoned in *Krawiec* that, while federal officers played a substantial role in the investigation and subsequent search, the warrant was a state-issued warrant given the fact that local police were also involved in the investigation and that the federal officers believed *in good faith* that the search was for the purpose of pursuing a state rather than a federal prosecution. *Id.* Under these circumstances, the First Circuit ruled that the state-issued warrant need not satisfy every requirement of Rule 41. Rather, recognizing the legitimate practice of state and federal cooperation in criminal investigations, the First Circuit held that a violation of Rule 41 did not require suppression if the state-issued warrant and the concomitant search satisfied constitutional requirements and did "'not contravene any Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers.'" *Krawiec*, 627 F.2d at 580 n.4 (citation omitted).[29]

---

[29] The First Circuit reiterated in *Mitro*, supra, and agreed with the Fifth Circuit in *Sellers*, supra, in establishing the analysis to be conducted by courts when state warrants have been used to obtain evidence that will be used in federal prosecutions: to admit such evidence courts must determine

In other words, if the warrant was a federal warrant, of course, it must comply with Rule 41. *Mitro*, 880 F.2d at 1485. But if the warrant was issued under the authority of state law, then "every requirement of Rule 41 is not a *sine qua non* to federal court use of the fruits of a search predicated on the warrant . . ." *Mitro*, 880 F.2d at 1484-85 (quoting *United States v. Sellers*, 483 F.2d 37, 43 (5th Cir. 1973*)*). Instead, it is the "Fourth Amendment, *not federal rules or state law*, [that] governs the admissibility of evidence obtained by state officers but ultimately used in a federal prosecution." *United States v. Syphers*, 426 F.3d 461, 468 (1st 2005) (quoting *United States v. Clyburn*, 24 F.3d 613, 616 (4th Cir. 1994)) (emphasis added); *see also United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) ("The question that a federal court must ask when state officials secure evidence to be used against a defendant accused of a federal offense is whether the actions of the state officials violated the Fourth Amendment of the United States Constitution." (Internal quotations and citation omitted)).

The rationale for this determination is based on the recognition that "Rule 41 and the Fourth Amendment are  not coextensive." *United States v. Schoenheit*, 856 F.2d 74 (8th Circuit 1988) (citing the district court order being affirmed). The Fourth Amendment is more extensive than the narrow requirements established in Rule 41. For example, the requirement of Rule 41(c) to conduct searches during the daytime has been recognized as a procedural rather than a substantive requirement and is *not* required by the Fourth Amendment. *See United States v. Searp*, 586 F.2d 1117, 1122-25 (6th Cir. 1978). Accordingly, as determined by the First Circuit, "nighttime searches are not per se unreasonable" under the Fourth Amendment. *McCarty*, 475 F.3d at 43. For that reason, requiring suppression in all cases where a procedural requirement, like the requirement that a search be conducted in the daytime pursuant to Rule 41(e)(2)(A)(ii) "unless the judge for good cause expressly

---

that the searches "satisfy constitutional requirements and *[don't]* contravene any 'Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers.'" *Mitro*, 880 F.2d at 1485.

authorizes execution at another time," is violated would be a remedy out of all proportion to the objectives of justice. *Searp*, 586 F.2d 1117, 1123-25. The indiscriminate application of the exclusionary rule to such non-constitutional violations of Rule 41 requirements is discouraged by the First, Second, Sixth, Eighth and D.C. Circuits, by our sister courts in the First Circuit and by this Court.[30] *Id*.

---

[30] **1st Cir.:** *United States v. Burgos-Montes*, 786 F.3d 92, 109 (1st Cir. 2015) (adopting standard established by the Second Circuit in *United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975), to require a showing of prejudice for a violation of technical requirements of Rule 41(e)(2)(A)(ii) regarding failure to establish by when warrant should be executed and judge to whom it should be returned to warrant suppression); *McCarty*, 475 F.3d 39, 44 (1st Cir. 2007) (finding that daytime search pursuant to state-issued warrant that commenced at 8:58 p.m. and continued for approximately one and half hours into the nighttime was reasonable and did not warrant application of the exclusionary rule); *Rivera-Rodríguez v. Beninato*, 469 F.3d 1, 7 (1st Cir. 2006) (finding that starting execution of a search at 5:50 a.m. was a *de minimis* deviation of Rule 41 requirement of daytime search requirements that was not an unreasonable violation of the Fourth Amendment); *United States v. Syphers*, 426 F.3d 461, 468-69 (1st Cir. 2005) (the defendant sought suppression based on a violation of Rule 41's 10-day stricture for execution of the warrant due to a five-month delay in a search of a computer. The First Circuit affirmed the district court's denial of the motion to suppress because the defendant failed to show that "the delay caused a lapse in probable cause, that it created *prejudice to the defendant*, or that federal or state officers acted *in bad faith* to circumvent federal requirements." (emphasis added)); *United States v. Mitro*, 880 F.2d at 1485-86 (1st Cir. 1989) (the defendant challenged the validity of a state-issued warrant because it was issued by an assistant clerk rather than a state court judge as required by Rule 41(a). The First Circuit found that the fact that the search warrant was issued by an assistant clerk rather than a state judge did not require suppression of the evidence because the officer authorized by state statute was a neutral, detached officer capable of determining whether probable cause existed in compliance with constitutional requirements.); *United States v. Young*, 877 F.2d 1099, 1105 (1st Cir. 1989) (determining that a search conducted through a state-issued warrant that started in the morning and continued throughout the night and for two additional days was not unreasonable under the Fourth Amendment); *United States v. Bonner*, 808 F.2d 864, 868–69 (1st Cir. 1986) (the First Circuit considered whether the fact that the search warrant was not in the agents' physical possession at the time of the search warranted suppression and rejected suppression citing *Burke* after finding that "[v]iolations of Rule 41(d) are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice.*")*; *Krawiec*, supra (1st Cir. 1980); *United States v. Dauphine*, 538 F.2d 1, 3 (1st Cir. 1976) (affirming denial of motion to suppress evidence procured through a federal warrant due to agent's failure to comply with Rule 41(d) ministerial requirements where defendant failed to demonstrate that he was prejudiced by the failure of the return to mention the revolver seized and because there was no indication that the agent was not acting in good faith). **2d Cir.:** *United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975) (the Second Circuit expressed that "courts should be wary in extending the exclusionary rule in search and seizure cases to violations which are not of constitutional magnitude" and held that Rule 41 procedural defaults should not lead to exclusion unless: (1) there is a showing of prejudice, in the sense that the search would not have occurred or would not have been so abrasive if the Rule 41 had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision of the rule by law enforcement); **5th Cir.:** *United States v. Marx*, 635 F.2d 436, 440 (5th Cir. 1981) (the defendant alleged a violation of Rule 41 concerning the execution of search warrants because the agents executing the warrant failed to provide him with a copy of the warrant as required by Rule 41(d) which mandates that officers give a copy of the warrant and a receipt for the property taken. The court considered this

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 34

---

a procedural violation but determined exclusion was not warranted because such a non-constitutional violation is not grounds for suppression unless it is shown to have affected the reasonableness of the search or caused prejudice to the defendant.); *United States v. Sellers*, 483 F.2d 37, 43 (5th Cir. 1973*)* (the Fifth Circuit examined whether the search conducted under a state warrant, which did not fully comply with Rule 41, could lead to suppression of evidence in a federal prosecution. The court found that while adherence to Rule 41 is important, violations of it do not automatically invalidate the constitutional protections provided by the Fourth Amendment unless they result in prejudice to the defendant or are otherwise unreasonable.); **6th Cir.:** *United States v. Twenty-Two Thousand, Two Hundred Eighty-Seven Dollars ($22,287.00), United States Currency*, 709 F.2d 442 (6th Cir. 1983) (the Sixth Circuit concluded that, while in the execution of a state-issued warrant executed after the specified nighttime period there were indeed violations of Rule 41 regarding failure to direct the warrant to a civil officer, lack of a ten-day limitation, and failure to require service during daytime hours and execution during nighttime period without showing reasonable cause for nighttime service, these technical deficiencies did not constitute a *per se* violation of the Fourth Amendment. The court ruled that the search was reasonable under the Fourth Amendment because there was sufficient probable cause for the seizure and no evidence of intentional disregard for the requirements of Rule 41. Thus, it affirmed that the exclusionary rule should not apply in this case due to the lack of prejudice resulting from the procedural violations); *United States v. Searp*, 586 F.2d 1117, 1122-25 (6th Cir. 1978) (the defendant contended that the search warrant was executed improperly, specifically arguing that the agents failed to provide a copy of the warrant to him at the time of execution, as required by Rule 41(d). The court ruled that while there were indeed violations of Rule 41, these procedural shortcomings did not constitute a violation of the Fourth Amendment. The ruling clarified that procedural errors under Rule 41 do not automatically invalidate a search under the Fourth Amendment unless they impact its reasonableness or lead to prejudice against the defendant.); **8th Cir.:** *United States v. Harris*, 324 F.3d 602, 606 (8th Cir. 2003) (the Eighth Circuit affirmed denial of motion to suppress based on allegation that nighttime search on a state-issued warrant commenced at 10:00 p.m. violated the Fourth Amendment because it was conducted in violation of Rule 41 for lack of a showing of necessity for nighttime search. "[A] court does not automatically suppress evidence gathered pursuant to a warrant, but instead considers whether the defendant was prejudiced or whether there was a reckless disregard of applicable procedure, both of which are absent here."); *United States v. Schoenheit*, 856 F.2d 74, 77 (8th Cir. 1988) (challenge to execution of a state-issued daytime warrant at 10:30 p.m. for failure to comply with Rule 41's daytime requirement does not warrant application of exclusionary rule under reasonableness test); *United States v. Brown*, 584 F.2d 252, 258 (8th Cir. 1978) (suppression of evidence not warranted in case where a search conducted pursuant to a state-issued warrant for failure to comply with Rule 41 requirements in a joint state and federal investigation); **D.C. Cir.:** *Youngbey v. March*, 676 F.3d 1114, 1125 (D.C. Cir. 2012) (determining that nighttime search was reasonable under state-issued warrant explicitly authorizing daytime or nighttime search. The court determined that executing a search at 4:00 a.m., even though the warrant did not specifically authorize a nighttime search, did not constitute an egregious violation of the Fourth Amendment. The court's decision emphasized that the reasonableness of a search is determined by examining the totality of the circumstances rather than adhering to strict time constraints.); **District Courts:** *United States v. Sayer*, 2012 WL 2180577 (D. Me. June 13, 2012) (denying suppression upon finding that failure of state-issued tracking order to comply with strictures of Rule 41, including its failure to specify daytime execution or to state good cause for nighttime execution in compliance with 41(e)(2)(c), does not "contravene any Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers," even more because there was no suggestion of *bad faith* in the procurement or execution of the tracking order); *United States v. Pryor*, 652 F. Supp. 1353, 1366 (D. Me. 1987) (court denied motion to suppress based on nighttime search under a federal warrant that authorized daytime or nighttime search absent and individualized finding of reason for nighttime search because suppression should not automatically result from any violation of the rules. "When there has merely been a violation of the

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 35

The First Circuit held in *Bonner* that when a violation of Rule 41 requirements is alleged, suppression is not required "unless the defendant can demonstrate prejudice." *Id.*, 786 F.3d at 869. The Court also explained that "[t]o show prejudice, defendants must show that they were 'subjected to a search that might not have occurred or would not have been so abrasive' had the rules been followed." *Bonner*, 808 F.2d at 869 (citing *Dauphine*, 538 F.2d at 3, and *Burke*, 517 F.2d at 386); *see also Burgos-Montes*, 786 F.3d at 109.

After recognizing that other circuits have held that violations of Rule 41's ministerial requirements do not require suppression unless the defendant can demonstrate prejudice, the First Circuit expressed that "[t]he exclusionary rule should be limited to those situations where its remedial objectives are best served, i.e., to deter illegal police conduct, not mistakes by judges and magistrates." *Burgos-Montes*, 786 F.3d at 109 (affirming denial of motion to suppress because the defendant failed to suggest, much less prove, why he was prejudiced by the warrant's technical failings). The First Circuit specifically referenced the Second Circuit in *Burke*, 517 F.2d at 386-87, and the Eighth Circuit in *Schoenheit*, 856 F.2d at 76-77, for the proposition that the exclusionary rule should *not* apply to searches conducted in violation of the strictures of Rule 41 absent a showing of prejudice to the defendant or bad faith by the law enforcement agents. But the Sixth Circuit has also applied the requirement of a showing of prejudice, as that term is defined in *Bonner* for a Rule 41 violation to warrant suppression. *See United States v. Searp*, 586 F.2d 1117, 1122 (6th Cir. 1978) ("[w]hile the police failed to comply with the procedural requirements of Rule 41(c), the search was nevertheless 'reasonable,' in the constitutional sense, because it was conducted pursuant to a valid state warrant, and met the requirements of the Fourth Amendment. Furthermore, the undisputed facts clearly show that this violation was not, and could not have been, a result of bad faith on the

procedural rules governing night searches, suppression, with its attendant potential for miscarriage of justice, is not justified when there was neither a possibility of *bad faith* conduct on the part of the police, nor *prejudice* to the defendant . . . .").

Case 3:22-cr-00356-ADC-MDM   Document 271   Filed 01/10/25   Page 36 of 71

*United States v. Alexis Vidal-Collazo*                                        Page 36
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

part of the officers involved . . . ."). Pursuant to this rationale, the Sixth Circuit also found in *$22,287.00 United States Currency,* that the exclusionary rule should not apply to a search that was conducted in the nighttime because "(1) if the search did actually begin in the 'nighttime,' it was so soon after 10:00 p.m. as to make the infraction *de minimis*; (2) there was a reasonable basis for a nighttime search if such had been expressly sought; (3) there is no indication that the search would have been less abrasive if it had been carried out shortly before 10:00 p.m.; and (4) there is no evidence of an intentional or deliberate disregard of the requirements of Rule 41(c)(1)." *Id.*, 709 F.2d at 449.

The First Circuit also adopted the Sixth Circuit's rationale in *$22,287.00 United States Currency*, when in *Beninato*, it found that the execution of a nighttime search that commenced slightly before 6:00 a.m. to be precisely the type of *de minimis* deviation from the Rule 41 strictures that would *not* have justified the application of the exclusionary rule. (Emphasis added). In *Beninato*, a civil matter, the defendant alleged that the search was conducted in violation of both the Fourth Amendment and the daytime requirement provided for in the warrant because execution of the warrant commenced at approximately 5:50 a.m. *Id.* The First Circuit held that "the execution must have occurred sometime after 5:50 a.m.—close enough to the 6:00 a.m. hour to make any deviation *de minimis. Id.*

Consistent with this First Circuit precedent, one of our sister court also found a night search "not unreasonable in the constitutional sense" because 1) there was no evidence of bad faith or intentional misconduct, 2) the record contained evidence that justified a nighttime search, 3) the warrant was supported by probable cause, and 4) there was no evidence of prejudice due to the night search. *United States v. Pryor*, 652 F. Supp. 1353, 1366 (D. Me. 1987); *see also United States v. Miller*, 442 F. Supp. 742, 756-757 (D. Me. 1977); *United States v. Kessinger*, 504 F. Supp. 494, 499-500 (D. Mass. 1980). Quoting from the Sixth Circuit in *Searp*, the district court in *Pryor* stated:

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 37

> [T]he particular procedures mandated before a night search may be conducted are not part of the fourth amendment, and we conclude that suppression should not automatically result from any violation of the rules. *A further inquiry into the actual search which occurred is permissible.* The courts should be guided by the principle underlying Rule 52(a), Fed.R.Crim.P., which provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."
>
> *      *      *
>
> When there has merely been a violation of the procedural rules governing night searches, suppression, with its attendant potential for a miscarriage of justice, is not justified when there was neither a possibility of bad faith conduct on the part of the police, nor prejudice to the defendant (in the sense that the search might not have occurred or would not have been so abusive if the requirements of the Rule had been observed).

*Pryor*, 652 F. Supp. 1365 (quoting *Searp*, 586 F.2d at 1124–25) (emphasis added).

### 4.  Defendant's challenge to the nighttime search

The defendant here challenges the validity and legality of the execution of the Warrant arguing that the PRPB agents acted outside of judicial authorization, and in violation of Fed.R.Crim.P. 41(e)(2)(A)(ii) because they executed the Warrant during the nighttime hours, namely at 4:57AM, after the state municipal court judge ordered the search to be conducted only during the daytime hours. The defendant avers that this express violation of the terms of the Warrant and of Rule 41 should result in a *per se* suppression of the evidence.

In the alternative, the defendant argues, applying the *Burke* prejudicial test adopted by the First Circuit in *Bonner*, that even if this Court were to find that this misconduct does not constitute a *per se* violation of the Fourth Amendment, the record nevertheless demonstrates that the pre-dawn execution of the Warrant resulted in such a prejudicial violation of the defendant's Fourth Amendment rights as to require suppression. He alleges that because the search would have been significantly less abrasive had it been executed during the daytime hours, thus after

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 38

6:00AM, the PRPB Agent's determination to conduct it at 4:57AM require the draconian sanction of suppression of all evidence gathered in the search and its fruits.

The Government submits various arguments in support of a finding that the PRPB Agent's determination to execute the search at a pre-dawn time was in compliance with the Fourth Amendment. It argues, first, that the execution of the Warrant at 4:57AM was a reasonable exercise of Governmental authority based on the totality of the circumstances that supported the issuance of the Warrant. Docket No. 39 at 15. Second, it submits that even assuming the PRPB Agents executed the Warrant beyond the time authorized by the state municipal court judge, the exclusion of the evidence in cases were the law enforcement agents choose the time of execution in response to a security concern would pay too high a cost to the criminal justice system compared to only having a minimal deterrent benefit. *Id.* at 16. Third, the Government claims that PRPB Agents did not act deliberately, recklessly or grossly negligent in executing the Warrant at that hour. *Id.* And fourth, it avers that PRPB Agents relied in good faith on the municipal court judge's approval of the Warrant application when they executed the search. *Id.*

5. <u>Application of the First Circuit's reasonableness test set forth in *Bonner and McCarty*</u>

Under Puerto Rico law, "daytime" is measured from sunrise to sunset. P.R. Law Ann. Tit 31 § 8.[31] Under Fed.R.Crim.P. 41, however, "daytime" is defined as "the hours between 6:00 a.m. and 10:00 p.m. according to local time." Fed.R.Crim.P. 41(a)(2)(B). In Docket No. 234, the Court granted the Government's request to take judicial notice that on August 5, 2022, sunrise in Puerto Rico occurred at 6:02AM. (*See* Docket No. 234 granting the Government's motion at Docket No. 221).

---

[31] 31 L.P.R.A. § 8 provides, in relevant part, that,

> [i]f in the laws, months, days, or nights are referred to, it shall be understood that the months consist of thirty days, the days of twenty-four hours, and the nights from the setting to the rising of the sun.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 39

Given the fact that PRPB Agents entered the defendant's home at 4:57AM, when the face of the Warrant limited its execution to within daylight hours only, the Court finds that under either Puerto Rico Law or Federal Law, there was a technical violation of Rule 41(e)'s good cause requirement for a night search. The question this Court must address, therefore, is whether that violation rises to such a level as to require application of the exclusionary rule. For the reasons that follow, the Court answers that question in the negative.

In this case, it is undisputed that the Warrant was authorized by a state municipal court judge and executed by PRPB agents. Federal agents did not get involved in the investigation until after the procurement and execution of the Warrant. The Warrant, therefore, is a state-issued warrant under the applicable analysis.

When determining the constitutionality of a nighttime search conducted pursuant to a state-issued warrant, *McCarty* instructs this Court to apply a reasonableness test based on the totality of the circumstances, which includes analyzing "the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it and the place in which it was conducted." *McCarty*, 475 F.3d at 44. Consistent with that analysis, this Court is called upon, pursuant to the holding in *Bonner*, to also apply a prejudice standard that is akin to the Sixth Circuit's two-prong test in *Burke. See Bonner,* 808 F.2d 869. Under such provisions, to apply the exclusionary rule, the defendant must show prejudice by demonstrating that he was "subjected to a search that might not have occurred or would not have been so abrasive had [Rule 41(e)] been applied," or demonstrate that there was intentional or deliberate disregard of Fed.R.Crim.P 41. *Bonner*, 808 F.2d at 869 (citing favorably to the prejudice test set forth in *Burke*, 517 F.2d at 386); *Syphers*, 426 F.2d at 468-69; *Schoenheit*, 856 F.2d at 77; *Pryor*, 652 F. Supp, at 1365 (quoting favorably *$22,287.00 United States Currency*, 709 F.2d at 49 in its application of the intentional and deliberate disregard of the requirements of Rule 41(c)(1)).

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 40

In this case, the Court finds that the predawn search of the defendant's home 1) did not cause any prejudice to the defendant resulting from the nighttime execution of the Warrant, and 2) there was no intentional disregard of the requirements of Rule 41. The Court also finds that based on a totality of the circumstances analysis, the search was reasonable under the Fourth Amendment. The Court explains.

i.    *No prejudice has been demonstrated*

The defendant argues in his Motion to Suppress that suppression of the evidence seized during the execution of the Warrant is appropriate because "it is difficult to perceive a more abrasive scenario than nine (9) Special Weapons & Tactics ("SWAT") officers breaking down the front door to one's home before dawn, tossing a sound grenade inside, and pointing long guns with lasers at an elderly father and his disabled son as they rose from bed." *See* Docket 30 at 11. The defendant further submits that "had this warrant been executed during the day, namely after 6:00AM, [the defendant] and his father would have likely been awake, alert, and in a better position to see the 30 police officers' approach, hear their commands (the front windows would have likely been open) and open the door for them so that the police did not have to break it down." *Id.*

In his Post-Hearing Brief, the defendant essentially repeated the same arguments he raised in his Motion to Suppress regarding the execution of the Warrant being abrasive, as conducted, but he failed to elaborate as to how the execution of the search would have been any less abrasive had it been conducted according to the face of the Warrant, that is one hour later, at 6:00AM. For example, contrary to the arguments raised in his initial Motion to Suppress, during the hearing there was no evidence or testimony presented as to when the defendant or his son typically wake-up in the morning. There was also no evidence or testimony to support his contention that "the front windows would have likely been open," nor that the door would have been open at 6:00AM "so that the police did not have to break it down."

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 41

The only testimony presented as to these matters was submitted in response to a question from defense counsel regarding how Mr. Vidal secures his home at night. In response, Mr. Vidal said that it was his practice to "lock everything up," including, in particular, the outside gate. It turns out, however, that notwithstanding his purported practice to regularly lock the outside gate, Mr. Vidal admitted that the night that PRPB Agents executed the Warrant, the outside gate had been left unlocked. Docket No. 211 at 137-38. Accordingly, whether Mr. Vidal typically locks the outside gate or not, the fact that it was left open on the very day of the execution of the Warrant precludes that from being an argument in favor of prejudice. Indeed, the fact that he left the gate open on the very day of the execution of the Warrant serves to demonstrate the speculative nature of defendant's purported reasons to support his argument that a search at 4:57AM was more abrasive than a search conducted only one hour later at 6:00AM.

Moreover, the fact that Mr. Vidal is an older gentleman and the defendant suffers from some mental deficiencies and can't read or write does not change that equation in any way. Indeed, irrespective of the hour a search warrant is executed Mr. Vidal would still be an older gentleman, the defendant would still have the same mental challenges, and the defendant would still be unable to read or write. Instead, the only difference would likely be the *possibility* that they might be awake one hour earlier, but again, there is no evidence in the record to support that contention. Given that as the only potential difference between a search conducted at 4:47AM versus a search conducted at 6:00AM, the Court is hard pressed to find any prejudice shown.

To be clear, searches involving the homes of individuals suspected of belonging to drug trafficking organizations or those suspected of having engaged in violent crimes, like murder, robbery or extortion, or those who are always armed or who traffic in illegal weapons, are always going to be abrasive. The SWAT Team will likely be used in every such case, as will flash bang grenades, because these safety measures are reasonable in light of the dangerous circumstances of the investigation. Given the violent nature of the crimes being investigated in this case, it is also likely that

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 42

anyone found inside of the home will be handcuffed during the execution of the search for their own safety and for the safety of others.

In the end, the principle question to ask here is whether such search would have been any less abrasive had it been executed one hour later at 6:00AM rather than at 4:57AAM. With the possible, yet speculative exception that one or more of the residents *might* have been awake at 6:00AM, the Court finds that there would have been be no other material differences between executing the Warrant at 6:00AM versus executing it at 4:47AM.

In sum, the Court finds no support in the record to conclude that a search conducted at 6:00AM would have been any less abrasive than the actual search that was conducted at 4:57AM, a time close enough to 6:00 a.m. as to make this violation of Rule 41 requirement a *de minimis* deviation that does not warrant application of the exclusionary rule.

    ii.   *The Court finds no intentional disregard of the requirements of Rule 41*

When Agent Ríos first sought authorization for the Warrant from the Puerto Rico municipal court judge, he was quite familiar with the defendant having had approximately six prior interactions with him and he even participating in his arrest in an unrelated case in 2020. Docket Nos. 88 and 103. Agent Ríos also knew that the defendant had a criminal history that included at least two prior federal criminal cases (the present case being his third federal criminal case). He also knew that the defendant belonged to a violent criminal organization headquartered in the Luquillo/Fajardo area that was responsible for committing multiple murders. All of this information would be considered collective knowledge for the team executing the Warrant.

In his application for the Warrant, Agent Ríos included the following information that was purportedly given to him by an anonymous caller. "[The defendant] is part of a criminal organization that operates in the town of Luquillo, transporting controlled substances in his vehicle around the rural area.

He carries a black pistol-type firearm in an illegal manner." Government Exhibit 4 at 3-4, Docket No. 239-1 at 3-4. In addition, Agent Díaz testified during the suppression hearing that at the time of the execution of the Warrant, both he and Agent Ríos were jointly "investigating criminal organizations in the area that deal in murder and the people who were performing those murders in the area of Fajardo." Docket No. 191 at 26. Lastly, and perhaps most important with respect to those responsible for executing the Warrant, the defendant was believed to carry a "black pistol-type firearm in an illegal manner." Government Exhibit 4 at 4, Docket No. 239-1 at 4. Given the dangerousness of the crimes under investigation, the leadership command in the PRPB assigned the SWAT Team to assist with entry into the defendant's residence. For all of the reasons mentioned above, Agent Ríos requested from the Court authorization to execute the Warrant at any time in the day or night. Government Exhibit 4 at 8, Docket No. 239-1 at 8. Surprisingly, and without explanation, though, the Warrant was issued for daytime execution only.

    With that as a background, the Court now turns to the question of whether there is "evidence of intentional and deliberate disregard of a provision of the Rule." In his Motion to Suppress, the defendant argued that because the execution of a search warrant requires a great deal of planning and coordination, the fact that PRPB supervisors certified that they had reviewed the Warrant to ensure that it contained no errors, necessarily demonstrates that the police deliberately disregarded the Warrant's daytime limitation. The Court does not agree.

    During the hearing, Agent Díaz testified that in his nearly thirty years of service with the PRPB, he has participated in more than 50 searches. Docket No. 191 at 23. He said that a majority of those searches, especially those involving firearms, were executed at night, which he understands to be from sunset to sunrise. *Id.* at 25-26. He added that it is rare, in his experience, for warrants to be executed during the day. *Id.* 26. The decision to request a nighttime search lies with the investigating agent and is requested for the purpose of intervening with people while they are

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 44

asleep so that the police can maintain the surprise factor and minimize the probability of a deadly confrontation. *Id.* at 26-27.

In this case, the SWAT Team was used because the defendant was considered armed and dangerous. *Id.* at 30. In addition, both Agent Diaz and Agent Ríos were investigating individuals suspected of performing murders in the greater Fajardo area. *Id.* at 26. On August 5, 2022, Agent Díaz arrived at the defendant's home at approximately 4:50AM in preparation for executing the Warrant. *Id.* at 28. As soon as he arrived, he was given a copy of the Warrant, which he reviewed to make sure it had no errors. *Id.* at 23-24. He testified that upon reviewing the Warrant, it looked like every other warrant he has dealt with and he understood it to have authorized a search during the day or night *Id.* at 24. Obviously, if Agent Díaz believed it provided for a search in the daytime *or* nighttime hours, he is mistaken. But the Court cannot say that such mistake rises to the level of demonstrating "intentional and deliberate disregard of a provision of the Rule."

Moreover, in reaching this conclusion, the Court takes into consideration the confusing and imprecise language in the Warrant regarding the time limitations on when the search was to be conducted. Instead of providing a categorical and unambiguous instruction that the search was to be conducted exclusively during the daytime, the Warrant copies verbatim the conditional language of Puerto Rico Rule of Criminal Procedure 231 by stating "[t]his order . . . shall be only served within hours of the day, *unless the magistrate, for compelling reasons, shall order it to be carried out at any time of the day or night.*" The inclusion of this conditional language in the Warrant could have reasonably lead the agents to misconstrue the authorization as including nighttime searches. The application did after all request authorization for a nighttime search.

Given the fact that the Warrant appeared indistinguishable from the majority of other warrants in which Agent Díaz has participated, and the fact that it included imprecise language that could be confusing to a nonlawyer and could even appear to grant authorization for a nighttime search, the Court finds it reasonable for the

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 45

agents to have overlooked the daytime only limitation, thereby incurring in a good faith mistake that does not rise to the level of intentional and deliberate disregard of a provision of the Rule. The use and presence of the SWAT Team evidenced the dangerousness that the executing officers faced and further supports their belief that the Warrant had been authorized for execution during either the daytime or the nighttime.

In conclusion, the Court finds that the exclusionary rule is not justified given the totality of the circumstances in this case. The defendant has not shown how he was prejudiced by the execution of the Warrant, which lasted only two hours and concluded at 7:00AM. The defendant has also failed to show how the agents acted in bad faith in the execution of the Warrant. Therefore, exclusion of evidence seized during the execution is not appropriate pursuant to defendant's challenge to the Warrant based on a nighttime search that violated Rule 41(e)(2)(A)(ii).

### C. Defendant's Fifth Amendment challenge to the inculpatory statements he gave to law enforcement

1. Findings of facts related to defendant's Fifth Amendment challenge.[32]

#### i. *Testimony of Dr. Alexandra Ramos Duchateau*

Dr. Alexandra Ramos Duchateau, a Clinical Psychologist with over 22 years of experience in her profession, testified for the defense as an expert in the field of Psychology. Docket No. 211 at 16-21. She was hired for the specific task of performing a psychodiagnostic evaluation of the defendant. *Id.* at 22. The purpose of the psychodiagnostic evaluation was to assess the defendant's mental health status and determine whether he suffered from any psychological issues. *Id.*

Dr. Ramos explained that before conducting the evaluation, and because the evaluation was voluntary, she started by obtaining the defendant's consent to proceed. *Id.* at 22. She said she uses a form for patients to sign to convey their consent

---

[32] The facts in support of this section were taken from relevant portions of the testimony given by Mr. José Vidal, Dr. Alexandra Ramos Duchateau, PRPB Agent Díaz, and Special Agent Burgos.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 46

to be evaluated. Knowing that the defendant does not read or write, she explained the form to him "little by little." *Id.* at 22-23. After about ten minutes of explaining, the defendant signed the form, however, Dr. Ramos clarified that signing the form did not necessarily mean that he read and understood the process. *Id.*

Dr. Ramos explained that the defendant reported that he was placed in a special education program in elementary school after failing first grade twice. *Id.* at 36. He also indicated that he stayed in special education throughout the remainder of his academic career. *Id.* at 36. He ultimately graduated from high school at the age of 18. *Id.* Despite years of formal schooling, she testified that the defendant is unable to read or write. *Id.* at 36. He also has difficulty with his memory and struggled to narrate his life's history. *Id.* at 38.

Based on her evaluation, she determined that the defendant, who was 32 years old at the time of the evaluation,[33] has a full-scale IQ of somewhere in the range of 55 to 63. *Id.* at 40. In her opinion, the defendant's cognitive functioning falls "in the range of moderate intellectual disability in pretty much all cognitive areas measured." *Id.* at 40.

She further opined that,

> Alexis Vidal fulfilled the minimal clinical requirements. He understood the role of his lawyer and Judge and the Assistant District Attorney. He understood the repercussions of a plea deal versus going to trial and he also understood conditions of probation.
>
> Despite his intellectual disability and with the aid of [a] lawyer, he can participate in the proceedings and competency in this case is tied to being able to consult with his lawyer and given his memory impairments, having the

---

[33] Dr. Ramos' clarified that her psychodiagnostic report contains a typographical error on page one incorrectly indicating that the defendant was 37 years old at the time of the evaluation. Docket No. 211 at 41.

> opportunity to consult frequently with his lawyer in order
> to maintain competency.

*Id.* at 41.

On cross examination, Dr. Ramos indicated that her evaluation of the defendant took approximately three hours to complete. *Id.* at 45. When she explained to him the concept of the limits of confidentiality, she said the defendant did not stop her, did not ask any questions, and *did* understand what she was explaining. *Id.* at 47. She also testified that after spending the approximately ten minutes explaining the consent form, he did finally understand the concepts contained therein. *Id.* at 48.

Dr. Ramos also indicated that as part of her psychodiagnostic assessment, she was unable to review any educational records as they were not available, and that her assessment as to his past special education experience was based solely on the defendant's self-reporting and his mother's summary of his intellectual disabilities. *Id.* at 57. She also said that she requested the defendant's medical records but none were provided. *Id.* at 60.

Dr. Ramos was then asked if she was aware that this case was the defendant's third criminal prosecution before the Federal Court and she said that she was so aware, but she indicated that she did not think that "type of exposure would necessarily lead to the type of learning that we would expect in people who do not have this type of intellectual disability." *Id.* at 62. When pressed, however, she clarified that she was not aware of his actual level of memory deficit, if any, regarding his previous criminal cases because she did not discuss those cases with him. *Id.* at 64-65.

ii.  *Testimony of defendant's father, Mr. José Manuel Vidal Velázquez*

Mr. Vidal testified that he lives in the Villa Angelina community together with his wife, María Teresa Collazo Baret ("Ms. Collazo"), and their son, the defendant. Docket No. 211 at 111. On August 5, 2022, Mr. Vidal was at home with his son as his wife was on vacation in Jacksonville, Florida. *Id.* at 111 & 139. Both he and his wife are retired. *Id.* at 111-12. Mr. Vidal suffers from high blood pressure and high

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 48

cholesterol. Mr. Vidal also confirmed that his son, the defendant, spent his academic career in special education and graduated after completing the twelfth grade. *Id.* at 113. He said that he informed the agents that his son suffered from "mental health conditions" and that "he doesn't know how to read or write." *Id.* at 136.

On August 5, 2022, at approximately 5:00AM, he was awakened to the sound of loud explosions. *Id.* at 113. When he walked out of his bedroom, he noticed that the room was full of smoke and there were police officers coming towards him yelling for him to put his hands up. *Id.* at 114. He said there were lasers pointed at his chest. *Id.* As he walked forward, he noticed that his son was face down on the ground already handcuffed. *Id.*

Mr. Vidal explained that after being handcuffed, the PRPB agents sat Mr. Vidal and the defendant in separate chairs in the living room. *Id.* at 125-26. *See also*, Defense Exhibit Q, Docket No. 240. Mr. Vidal said one of the agents, a supervisor, began asking the defendant questions like, "where did he have the weapons."[34] *Id.* at 126. The same supervisor also said to the defendant, "[W]e are going to take your father also if you don't tell us what we want to find." *Id.* When asked how many times his son was asked that by the supervisor, Mr. Vidal said "the entire time he would come up to him and say, if [the] guys find something, whatever they find and you don't tell me, now is your chance or I'm going to arrest you and I'm going to take your dad and arrest him . . . ." *Id.* at 129. He said that the supervisor also directed the same question to him, namely, "If you know something, if you know that there's something here, you should say so, tell me or I'm going to arrest you, too. Tell your son to tell because I will take him and arrest him." *Id.* Mr. Vidal responded by denying any knowledge of what was going on. *Id.*

After the PRPB agents located the firearm and ammunition inside the house, both Mr. Vidal and his son were placed under arrest. Mr. Vidal explained, however,

---

[34] Agent Díaz denied making any comments to the defendant about his father. Docket No. 191 at 41.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 49

that before being placed in the patrol car the supervisor approached the defendant again and said, "I told you so[,] that if you wouldn't tell me where . . . everything [was], I was going to take your father away. Now there's no break. I'm going to take him[,] arrested[,] and I'm going to take you." *Id.* 132.

Mr. Vidal also testified that once they arrived at the police station, that same supervisor, once again, addressed the defendant saying something to the effect of,

> "See what's happening? Your father is arrested. I told you. I gave you a chance to talk to me and you wouldn't talk to me. Now I arrested you and I arrested your father and he's here nervous" and they asked if he knew something about some murders that had happened around the area and then my son would answer him, "no, what do you think I am? I don't know anything about that. Go ask a different person."

*Id.* at 135. Mr. Vidal also said that at some point while at the police station, he saw his son crying. *Id.* at 136.

On cross examination, Mr. Vidal admitted that at no time did he or his son tell the PRPB agents that there was a gun in the house, nor to his knowledge, did either of them claim ownership of the firearm and ammunition that was found inside the house. *Id.* at 148-50.[35]

### iii. *Testimony of PRPB Agent José A. Díaz Garcia*

As explained before in Section II(B)(1) above, Agent Díaz testified that during the search of the house, the defendant volunteered that his father wasn't responsible for anything that was found; that he, instead, was responsible for it. Docket No. 191 at 34. Agent Díaz explained that at that moment he interrupted the search to read

---

[35] The cross examination of Mr. Vidal continued a bit more and involved a lengthy discussion over Mr. Vidal's household policy for smoking inside the home. The Government also sought to introduce into evidence a photo, found on the defendant's phone, depicting the legs and hand of an unidentified individual holding an unlit cigarette sitting on the front porch of Mr. Vidal's home. Given the Court's factual findings and recommendation regarding the *Franks* issue, any discussion of whether the defendant *actually* smokes cigarettes is irrelevant to every issue in this case. The Court, therefore, intentionally omits any part of Mr. Vidal's testimony regarding whether the defendant in facts smokes cigarettes.

the defendant his *Miranda* rights and that the defendant appeared to understand those rights because he remained silent after his rights were read to him. *Id.*

Agent Díaz also explained that the defendant interrupted him again when he reached the defendant's bedroom and said that what Agent Díaz was looking for was outside in defendant's vehicle. *Id.* at 35. Agent Díaz paused his search of the defendant's room to look in the car, but nothing was found therein. *Id.* at 34-36. Agent Díaz then continued his search of the defendant's room where the firearm was ultimately found.

After transporting the defendant to the police station, Agent Díaz read him his *Miranda* rights a second time and the defendant checked the appropriate boxes on the form himself.

        iv.   *Testimony of ATF Special Agent Joshua Burgos Soto*

At approximately 1:00-1:30PM on August 5, 2022, ATF Special Agent Joshua Burgos and ATF Task Force Agent Sheila Avilés arrived at the Homicide Division Office in Fajardo where they came across the defendant and his father sitting calmly in the reception area, neither one was handcuffed. Docket 192 at 10-12. After consulting the matter with Agent Díaz, Agents Burgos and Avilés were offered a quiet room with a window to conduct an interview of the defendant. *Id.*

At approximately 2:00PM, the interview began with Agent Burgos asking the defendant if he goes by any aliases, to which the defendant said that he goes by the nickname "Coquí." *Id.* at 13. Agent Burgos also asked him about his educational background and the defendant said that he graduated from high school. *Id.*

Then, following ATF's standard procedures, Agent Burgos began recording the interview, a transcript of which was introduced into evidence as Government Exhibits 18 & 19, Docket No. 239-2 at 10-31. Agent Burgos started by reading the *Miranda* rights out loud to the defendant. *Id.* at 16. Agent Burgos said that it is a common practice of his to read the *Miranda* rights out loud whenever the interview is recorded so that the device captures the exchange. *Id.* After reading each right, Agent Burgos asked the defendant if he understood that right, to which the defendant

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 51

responded in the affirmative each time. Government Exhibit 18 at 1-3, Docket No.
239-2 at 10-12.

Agent Burgos then read out loud the section entitled "Waiver." It provided as
follows:

> I have read these statements of my rights or they have been
> read to me and I understand my rights. At this time, I am
> willing to answer the questions without having an attorney
> present. I have been made no promises, and no pressure or
> coercion has been used against me . . . been used against
> me in any way.

Docket No. 239-2 at 3. When Agent Burgos asked the defendant if he understood, the
defendant responded, "What, No." *Id.* at 3. Whereupon, the following exchange took
place in which Agent Burgos further explained the need for the defendant to make a
choice as to whether to waive his rights and the defendant expressed his concerns for
his father without prompting by the agents:

| Agent Burgos: | Okay. What the waiver explains is that after reading all your rights and if you want to talk to us and hear the questions that we have . . . |
|---|---|
| Defendant: | Yes. |
| Agent Burgos: | . . . because remember, we have a version from the police, but we always give people the opportunity . . . |
| Defendant: | Uh-huh. |
| Agent Burgos: | . . . to give us their version. |
| Defendant: | Uh-huh. |
| Agent Burgos: | And that is why we are reading you your rights. |
| Defendant: | Uh-huh. |
| Agent Burgos: | But you have to waive them. Obviously, having an attorney present and to be able to talk to us, [you need to] tell me: "Look, yes, I understood." |

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 52

| | |
|---|---|
| Defendant: | Okay. |
| Agent Burgos: | "I want to talk to . . . I want to talk to you," and sign the document for me. |
| Defendant: | Yes. |
| Agent Burgos: | Do you want to talk to us? |
| Defendant: | Okay. |
| Agent Burgos: | You have to... you have to say "yes". |
| Defendant: | It's just that I don't know what to tell you. |
| Agent Burgos: | It has to come from you. |
| Defendant: | But yes, I want to get my dad out of this. |
| Agent Burgos: | Well, if you want to . . . |
| Defendant: | Man, yes, I want to get my dad out. |
| Agent Burgos: | Precisely, If, well . . . If you want to . . . if you want to talk to us, you have to tell me . . . |
| Defendant: | Yes. |
| Agent Burgos: | . . . if you understood that you are waiving the right to have an attorney present at this time to talk to us. |
| Defendant: | The thing is I don't have an attorney right now. |
| Agent Aviles: | That is up to you. We can't tell you "yes" or "no." That is your decision. |
| Agent Burgos: | Exactly. It's your decision, man. |
| Defendant: | Well, yes, I want to get my dad out of this. To have them take me only. My dad has nothing to do with anything. |
| Agent Burgos: | All right. So, then, you do want to talk to us? |
| Defendant: | Uh-huh. |
| Agent Burgos: | Yes? Then, sign here, please. |

Government Exhibit 18, Docket No. 239-2 at 4-6.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 53

After agreeing to be interviewed, the defendant signed the Waiver of Rights Form at 2:05PM, and Agent Avilés signed as a witness. *See* Exhibit 20 at Docket No. 39-5 and 239.

Throughout the interview, the defendant frequently raised concerns over his father without any prompting by the agents. Docket No. 239-2 at 5, 6, 8, 9, 10, 11, and 14. For example, in response to Agent Burgos' explanation that the decision to file federal charges will depend on the result of the interview, the defendant again interjected a reference to his own concern for his father, saying, "Yes, because he has nothing to do with this situation, you get me? Docket No. 239-2 at 8-9. Not knowing to whom the defendant was referring, Agent Burgos asked, "Who is 'he'?" *Id.* at 9. It was the defendant who explained that he was again referring to "My dad." *Id.*

Thereafter, the interview centered on the events of August 5, 2022, and the defendant admitted that a gun was found under his bed which he had recently purchased himself. *Id.* at 11 and 13. He also admitted that he had two prior federal cases and that he was well aware that he was prohibited from owning or carrying a firearm, saying "I'm clear about that." *Id.* at 11-12, 17 and 18. During the approximately 16-minute-long interview,[36] the defendant chose what questions to answer and which questions not to answer. *Id.* at 14.

    2.  <u>Defendant's Fifth Amendment challenge to the inculpatory statements he made to ATF agents contending that they were not knowing and voluntary, or in the alternative, that they were coerced due to threats he received from officers to arrest his father</u>

        i.  *Defendant contends that he did not knowingly and voluntarily waive his Fifth Amendment Miranda rights*

The defendant next contends that due to his intellectual disability, he did not fully understand his Fifth Amendment Miranda rights, and therefore his waiver of

---

[36] The interview was conducted in two separate recorded sessions. The first session started at 2:02 p.m., lasted approximately 13 minutes and its transcript was entered as Government Exhibit 18, Docket No. 239-2. The second session took place at approximately 2:29 p.m., took approximately 3-4 minutes and its transcript was entered as Government Exhibit 19, *see* Docket No. 239-2. The audio recordings of both sessions of the interview were admitted into evidence as Defense Exhibit I, Docket No. 240-1.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 54

those rights was not knowing or voluntary. In analyzing the totality of the circumstances, and for the reasons that follow, the Court does not agree.

In *Miranda v. Arizona*, the Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467 (1966). To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused. *Moran v. Burbine*, 475 U.S. 412, 420 (1986). In particular, prior to the initiation of questioning, they must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." *Id. at 421 (quoting Miranda* at 468–470.

*Miranda* also holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Moran*, 475 U.S. at 421 (quoting *Miranda*, at 475). The inquiry has two distinct dimensions. *Moran*, at 421 (citing *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) and *Brewer v. Williams*, 430 U.S. 387, 404 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran*, at 421. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, (1979)). The burden rests with the Government to prove, by a preponderance of the evidence, that a defendant's statements are admissible. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 55

a) *The opinions of defendant's psychological expert witness*

The defendant did not testify during the multi-day suppression hearing, therefore any evidence of his alleged mental disability and inability to read or write was introduced through the defendant's father and through the psychological expert, Dr. Alexandra Ramos Duchateau. Dr. Ramos was hired by the defendant to determine whether he suffers from any mental conditions that would affect, among other things, his ability to understand the *Miranda* waiver.

As part of her evaluation, which lasted all of three hours, she interviewed the defendant and his mother. Though she had requested from the defendant copies of his educational and medical records, none were provided. Accordingly, any medical and mental health history and any educational history was self-reported by the defendant or was reported by his mother. Docket No. 211 at 58.

Dr. Ramos reported that the defendant is 32 years old and lives with his parents. He has never lived independently but did report having a girlfriend of six years, who has three (3) children from another relationship. Docket No. 30-8 at 2.

In terms of schooling, the defendant self-reported to Dr. Ramos, and his father testified, that the defendant graduated from high school after participating in special education throughout his entire educational career. The defendant also reported to Dr. Ramos having been diagnosed with an intellectual disability for which he receives social security benefits. *Id.* Dr. Ramos administered an IQ test to the defendant, and pursuant to her evaluation, she diagnosed him with a full-scale IQ of between 55 to 63. Notably, however, the defendant reported not participating in any mental health treatment or ongoing habilitation program. *Id.*

Overall, Dr. Ramos opined that the defendant's "intellectual disability presents with difficulties in memory, learning, reasoning, planning for future events, anticipating consequences and communication skill." Docket No. 240-1 at 31. Notwithstanding such limitations, Dr. Ramos opined that the defendant understands the role of his lawyer, the judge, and the prosecutor. *Id.* He also understands the repercussions of a plea deal vs. going to trial, and the conditions of probation.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 56

She noted that the defendant, "with the aid of his lawyer, should be able to understand the legal proceedings, consult with counsel and make decisions about his legal case." *Id.* Accordingly, the defendant concedes that he is competent to proceed to trial. Docket No. 217 at 7.

After having heard from Dr. Ramos and evaluated her demeanor and the substance of her testimony, the Court finds her testimony and her conclusions of little relevance to our analysis. To begin with, given the overwhelming amount of information that was self-reported by the defendant and his self-interested mother, the Court finds the materials used by the evaluator to reach her conclusions to be unreliable. She requested important medical and educational records that would have corroborated the things that she was told, but they allegedly never arrived or weren't provided.

In addition, at times in her testimony Dr. Ramos appeared to go out of her way to support the interests of the defense instead of presenting a neutral psychological opinion of the defendant. For example, when questioned on the stand about the fact that the defendant signed the consent form to be evaluated, she added that the defendant's signature on that document does not mean "that he read and understood the process." However, just a few moments later, she backpedaled and conceded that the defendant understood that very document after 10 minutes of explanation.

Furthermore, when she was confronted with the fact this was the defendant's third federal criminal case, she sought to minimize the impact of his criminal history and experiences as a factor in the required competency analysis. Docket No. 211 at 63. She indicated that she did not discuss his prior criminal prosecutions with the defendant because "[t]hat was not part of the referral question." *Id.* at 63-64. When asked by the prosecutor if she would "consider that level of exposure (i.e. three federal criminal cases) to the criminal justice system as the type of simplification and repetition that would help him comprehend the criminal justice system," Dr. Ramos sought to equate his inability to learn the alphabet, despite repetition, to not learning from such life-changing experiences as three federal criminal prosecutions. *Id.* at 62.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 57

She offered up a generic opinion that she does think that that "type of exposure necessarily would lead to the type of learning that we would expect in people who did not have this type of intellectual disability." *Id.* at 62.

The Court is not moved by Dr. Ramos' testimony regarding generalities and her attempt to discard important life experiences as not having an impact on defendant's development and capacity. That such information was admittedly not incorporated into Dr. Ramos' evaluation and conclusions makes her given testimony unreliable and of no consequence to the Court's analysis.

Dr. Ramos' testimony did not convince the Court that the defendant was incapable of functioning within the normal range in orientation, language comprehension, naming ability, memory, abstract reasoning and judgment. Indeed, having a low IQ is not dispositive in the evaluation of a defendant's capacity to make a knowing and voluntary waiver of *Miranda* rights. *See United States v. Rojas–Tapia*, 446 F.3d 1, 7 (1st Cir. 2006) ("More particularly, the fact that Rojas-Tapia has a relatively low I.Q., standing alone, is not dispositive of the waiver determination.").[37]

> b) *Defendant's prior experience with the criminal justice system*

Notwithstanding the opinion of Dr. Ramos, the Court does not believe it reasonable to compare prior criminal cases where one is deprived of his liberty with

---

[37] Federal circuit courts have found several instances where defendants, despite their mental retardation or low I.Q.'s, were found to have waived their rights knowingly and intelligently. *See, e.g., Clark v. Mitchell,* 425 F.3d 270, 283 (6th Cir. 2005) ("The inquiry is not whether 'a criminal suspect know[s] and understand[s] every possible consequence of a waiver of the Fifth Amendment privilege.'" The appellate court found defendant's borderline retardation (in the words of the testifying expert) or low average intellect not dispositive.); *United States v. Turner,* 157 F.3d 552, 555 (8th Cir. 1998) (holding that defendant's borderline I.Q. did not prevent a knowing and intelligent waiver); *Rice v. Cooper,* 148 F.3d 747, 750–51 (7th Cir. 1998) (holding that mildly retarded defendant gave a valid waiver because police had no reason to suspect that he did not understand the warnings); *Correll v. Thompson,* 63 F.3d 1279, 1288 (4th Cir. 1995) (finding confession by defendant with an I.Q. of 68 knowing and voluntary where he had received *Miranda* warnings in the past); *Winfrey v. Wyrick,* 836 F.2d 406, 411 (8th Cir. 1987) (finding that where primary facts suggesting coercion were limited to his age and low IQ, confession was voluntary. These factors alone were not sufficient to invalidate defendant's confession.). While the appellate courts have recognized low IQ as a relevant factor, the ultimate determination is that weak mental abilities, standing alone, do not necessarily render confessions involuntary under the due process clause. The circuits have referenced the Supreme Court's decision in *Colorado v. Connelly,* 479 U.S. 157, 168 (1986), which held that reduced mental capacity *alone* does not render a confession involuntary under the due process clause in the absence of police coercion.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 58

learning the alphabet. For that reason, the defendant must have learned from the experience, and his conduct and demeanor on August 5, 2022, as evidence by the record, supports such a finding. The Court therefore will not consider the defendant an expert in the criminal justice system, but it will not consider him a neophyte either. A neophyte, for example is unlikely have a clue as to the role of the U.S. Probation Office, nor as to what conditions of release are. But according to Dr. Ramos, the defendant certainly knows and understands these concepts.

c) *Defendant was read his Miranda rights multiple times*

Even though the Court is giving little weight to Dr. Ramos' testimony, it goes without saying that repetition helps everyone learn better. In this case, the defendant has certainly enjoyed repetition with respect to having his *Miranda* rights read to him. *Rojas-Tapia*, 446 F.3d at 8 ("Rojas-Tapia's repeated earlier exposure to *Miranda* warnings made it extremely unlikely that he failed to understand his rights at the time he made these incriminating statements."); *United States v. Palmer*, 203 F.3d 55, 61 (1st Cir. 2000) (observing that sixteen prior arrests constituted competent evidence of adequate comprehension). More specifically, the defendant here was shown, read, and explained his *Miranda* rights at least three separate times, all within the same day. The first time was when the defendant blurted out to Agent Díaz before the search even began that his dad "wasn't responsible for anything that was found [in the house]." Docket No. 191 at 34. When Agent Díaz heard him say that, he immediately read him his *Miranda* rights out loud "so he wouldn't self-incriminate." Docket No. 191 at 34. Then, in response, to having heard his *Miranda* rights, the defendant immediately shut up and did not say another word. Agent Díaz said he believed that the defendant fully understood his *Miranda* rights because after having them read to him, he acted consistent with understanding them.

The second time the defendant had his *Miranda* rights read aloud to him that day was after both he and his father were transported to the police station for questioning. When they arrived at the station, Agent Díaz handed the defendant the standard *Miranda* rights form for him to read. Not knowing that the defendant could

not read himself, but nevertheless following police protocol, Agent Díaz read the *Miranda* rights form to the defendant out loud. Agent Díaz saw the defendant appearing to follow along giving no indication that he could not understand the form. The defendant then signed it in the appropriate space and his father signed as a witness.

The third time the defendant had his *Miranda* rights read to him is well documented in the custodial recording made with ATF Special Agent Joshua Burgos. Agent Burgos again read aloud his *Miranda* rights and asked him after reading each one if he understood it, to which the defendant said "yes." Then, when he was read the "Waiver" language, the defendant demonstrated some confusion so Agent Burgos took his time and explained that provision more completely. He continued to explain the provision to the defendant for as long as it took for him to indicate that he understood.

In addition, when the defendant was asked about how much he paid for the firearm, he paused in such a way that Agent Burgos said to him, "If you don't want to answer that question, you don't have to answer it." "It's your right to do that (unintelligible)." Docket No. 239-2 at 23. In response, the defendant ended up refusing to answer that question so Agent Burgos simply moved on with the interview and never got an answer as to how much he paid for the firearm. *Id.* Such conduct demonstrates to the Court that not only did the defendant understand his *Miranda* rights, but he also appreciated how to apply them.

> d) *Defendant was astute enough to attempt to deceive Agent Díaz during the execution of the Warrant*

Agent Díaz explained during the suppression hearing that as he was conducting the search, he began as he typically does, moving from the right side of the house to the left side with the defendant in tow. When he got to the defendant's bedroom, the defendant quickly interrupted him and said that what he was looking for is in his car. At that point, Agent Díaz stopped searching inside and went out to the car together with the defendant. After finding nothing in the car, Agent Díaz

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 60

returned to the search of defendant's room where he found the firearm and the ammunition. The Court interprets this as an attempt by the defendant to derail in some unusual way the execution of the search. The Court finds that someone who does not have the mental capacity to be able to consent to a search would similarly not have the mental acuity to attempt to interrupt or sabotage the execution of a search in progress.

### e) *Defendant's demeanor during the recorded custodial interview*

The Court has reviewed in close detail the transcript from the defendant's recorded custodial interview and notes that the defendant appears lucid and articulate throughout.[38] His answers were responsive to the questions asked; he himself asked questions, and most importantly, he refused to answer questions after being told that that was his right. Docket No. 239-2 at 14. Simply put, there does not appear to be any sign of a weakened mental state or a lack of understanding that would cause the Court to suspect that defendant's consent to participate in the custodial interview was somehow unknowing or involuntary.

The Court finds that the Government has proven by preponderance of the evidence that the defendant voluntarily waived his right to remain silent. But the analysis does not end there.

Though the defendant appears to suggest in his Motion to Suppress that voluntariness *alone* should justify suppression of all the evidence, "[a] defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness." *See Rojas-Tapia*, 446 F.3d at 1 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986) and *United States v. Palmer*, 203 F.3d 55, 61–62 (1st Cir. 2000)). Rather, "[t]he voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on

---

[38] The Court has listened to the audio recording of the interview as well, however, for purposes of this Report and Recommendation, it will limit its observations and opinions to the transcript of the recording.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 61

'free choice' in any broader sense of the word." *Connelly*, 479 U.S. at 170. For that reason, it is imperative for the Court to address defendant's second contention too, namely whether the defendant was coerced or intimidated into consenting to sit for a custodial interview with ATF agents.

> ii. *Defendant contends that his confession was involuntary because he was coerced and intimidated into confessing due to a supervisory agents' multiple threats to arrest his father if he refused to confess*

The defendant also contends that the agents overpowered his will by threatening to arrest his father if he did not agree to confess to possessing the firearm. As to this contention, and for the reasons that follow, the Court agrees and recommends that the statements he made during his custodial interview with ATF agents be suppressed.

It is well established that the Government may not use an involuntary confession against a defendant at trial. *See Dickerson v. United States*, 530 U.S. 428, 434 (2000). A coerced confession is improper because it is not "the product of a rational intellect and a free will." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (internal quotation marks and citation omitted). The introduction of such evidence violates an individual's due process rights and thus requires reversal regardless of the sufficiency of the remaining record. *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990). When the voluntariness of a confession is challenged, the Government must prove by a preponderance of the evidence that it was properly elicited. *Id.*

To make a voluntariness determination, the court must engage in a "totality of the circumstances" inquiry. *Hughes*, 640 F.3d at 438. This requires the court to balance the officers' tactics with the unique background of each individual suspect. *Id.* The lynchpin of the Court's analysis is whether the Government's conduct overpowered the will of the defendant. *See Jackson*, 918 F.2d at 242.

There are a number of cases, many from within our own circuit, dealing with law enforcement agents' practice of using family members in an attempt to persuade defendants to provide information during an interrogation. In each case, the courts

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 62

have recognized the difficulty of such decision given the fact-intensive nature of the totality-of-the-circumstances inquiry.

One seminal case in the First Circuit on this topic is *United States v. Hufstetler*, 782 F.3d 19 (1st Cir. 2015). In *Hufstetler*, the New Hampshire State Police and the FBI were investigating a bank robbery at the Guardian Angel Credit Union in Berlin, New Hampshire. They had identified Daniel Hufstetler ("Huftsetler") and his girlfriend Sheena Craig ("Craig") as the primary suspects. After arresting Hufstetler and Craig, three law enforcement officers interrogated Hufstetler. The agents mirandized Hufstetler and then tape recorded the entire interview. *Id.* at 20.

At the time of Hufstetler's interview, the officers had already developed a great deal of evidence against both him and Craig, so during the interview, the officers were not bashful in stating that the purpose of the interrogation was, in part, to determine Craig's precise role. Though they knew that Craig drove Hufstetler to the bank, they knew little else about her culpability. FBI Special Agent Laura Hanlon therefore said to Hufstetler, "This is your opportunity to explain to us what her role is," and, "she's down there [being held by officers] based on what we have right now." Berlin Police Corporal Luc Poulin then asked, "[W]as she there on her own accord or did she not know what was going on?" Later on, that same officer cut right to the chase and stated, "I know it was you. I already know it was you . . . My only intention up here Daniel, is to figure out [Craig's] involvement." *Id.*

After Hufstetler repeatedly expressed concern for Craig, his interrogators identified her as his weakness and explained how his cooperation could or could not assist Craig. For instance, Special Agent Hanlon said, "You should feel like a real heel because you put her in this position . . . Our job is to find [the person responsible for the robbery] and arrest him . . . We feel we've done that job." At another point, Special Agent Hanlon also stated, "you should be upset because you care for her and this is quite disruptive to her life." Corporal Poulin summed it up for Hufstetler by saying, "There's obviously different outcomes for [Craig], depending on what it is in the details that we're looking for here." Critically, the officers consistently told

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 63

Hufstetler that he needed to tell the truth and that they lacked the authority to make any guarantee or promise in exchange for his cooperation.

 After approximately two hours and fifteen minutes of obfuscating answers, no answers at all, or steering the conversation back to Craig in a blatant attempt to secure a deal for her, Hufstetler finally seemed satisfied that his confession would save Craig from criminal charges. He then confessed and took full responsibility for the robbery. A federal grand jury then indicted Hufstetler for having committed the robbery. Prior to trial, Hufstetler moved to suppress the confession. The district court's denial of the motion to suppress and Hufstetler's subsequent conviction brought the matter before the First Circuit.

Hufstetler cited to a number of examples from the transcript from his custodial interview where he claimed the officers made improper threats or promises conditioning Craig's release on his willingness to confess. For example, he quoted the officers as saying: "I certainly don't want to see those kids be without their mother;" "[T]here's obviously different outcomes for [Craig], depending on what it is in the details;" and, "[Y]ou can save her a buck by saying that you didn't tell her what you were gonna go do, but you're not doing that." Hofstetler argued that the officers deliberately preyed on his emotions to force a confession from him.

On appeal, the First Circuit recognized two clusters of cases addressing this topic. The first cluster, largely from outside this circuit, has found that "the use of a family member uniquely tugs at a suspect's emotion and thus can have an undue impact." *Id.* at 22. Most notable within that cluster are two Supreme Court cases. The first case, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963), involved officers informing a defendant that her failure to cooperate would result in her losing financial aid for, and custody of, her children. 372 U.S. at 534. The Court noted that the defendant had no reason to question the officers' capacity to carry out those threats. *Id.* Accordingly, the Court deemed the tactics improper and ordered the confession suppressed.

A few months later in *Haynes v. Washington*, 373 U.S. 503 (1963), the Court reiterated this point. In *Haynes*, interviewing officers repeatedly told a suspect that

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 64

he would be unable to call or see his wife until he wrote out a confession. 373 U.S. at 507. Those threats occurred over a number of days and the defendant "gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands." *Id.* at 514. The Court deemed this improper and, when weighed against the defendant's susceptibility to coercive tactics, found the confession to be involuntary. *See Hufstetler*, 782 F.3d at 22.

The second cluster of cases is represented by the First Circuit's decision in *United States v. Jackson*, 918 F.2d 236 (1st Cir. 1990), among others. In *Jackson*, the Court held that the officers' mentioning of defendant's sister being under arrest for a related gun violation and stressing that his confession could assist her, did not vitiate the voluntariness of Jackson's confession. *Hufstetler*, at 23 (citing *Jackson*, 918 F.2d at 241). In so holding, the court concluded that 1) the statement was "neither a direct threat nor promise," 2) there was no evidence to suggest that they "enjoyed a particularly close relationship," and 3) Jackson was "not particularly susceptible to psychological coercion on that account or any other." *Hufstetler*, at 23.

In a more recent First Circuit case, *United States v. Jacques*, 744 F.3d 804 (1st Cir. 2014), the interrogating officers remarked "on the failing health of Jacques's elderly father, suggesting that continued resistance might deprive Jacques of crucial years with his family." 744 F.3d at 808. In response to an involuntariness challenge, the First Circuit stated that "statements that a defendant's refusal to cooperate may lead to an extended separation from his or her loved ones may contribute to a finding that the defendant's confession was coerced . . . [h]owever, the mere fact that a defendant is placed under some psychological pressure by agents does not necessarily render a confession involuntary." *Hufstetler*, at 23 (quoting *Jacques*, 744 F.3d at 811 (internal quotation marks and citation omitted)). The Court ultimately concluded that the subsequent confession was voluntary because there was only a single reference to the family member, the suspect's demeanor during the interrogation did not manifest any notable psychological or emotional anxiety, and there was no evidence that he was particularly susceptible to coercion. *Id.*

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 65

In determining which of the two clusters Hufstetler's situation belonged, the Court noted that when evaluating the propriety of police tactics, courts should consider "the totality of the circumstances," which may include the "length and nature of the questioning," the existence of any explicit or implicit threats, and any deprivation of a suspect's essential needs. *Hufstetler*, at 24 (quoting *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). A promise or threat need not be explicit, but can also result from "[s]ubtle psychological coercion." *United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.1981).*

In holding that there was no improper threat or promise made to induce Hufstetler to confess, the Court noted that,

> the officers *had probable cause to hold Craig*. In such a circumstance where the referenced relative is *both a family member and a co-suspect*, probable cause for holding that individual helps to place the officers' statements in context. *Without more, an officer's truthful description of the family member's predicament is permissible* since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability.

*Hufstetler*, at 25. (Emphasis added).

The Court noted that, while it must have been "difficult for Hufstetler to swallow," the officers never lied, nor did they condition either individual's release on Hufstetler's willingness to speak. *Id.* Instead, the Court stated that the "record reflects little more than officers, faced with two criminal suspects, attempting to sift out each individual's role." *Id.* For that reason, the Court noted that Hufstetler's circumstances were more similar to the *Jackson* and *Jacques* cluster of cases rather than the *Lymumn* cluster. *Id.*

After finding that the officer's comments regarding Craig did not constitute improper threats or promises, the Court in *Hufstetler* noted that in addition to considering the officers' actions, it is also necessary to determine whether Hufstetler was susceptible to the allegedly illegal police conduct. *Jackson*, 918 F.2d at 242. In conducting such examination, the First Circuit has said that courts must evaluate a

Case 3:22-cr-00356-ADC-MDM    Document 271    Filed 01/10/25    Page 66 of 71

*United States v. Alexis Vidal-Collazo*                                    Page 66
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

defendant's "age, education, intelligence, and mental condition," and any "prior experience with the criminal justice system." *Jacques*, 744 F.3d at 809. After finding no support in the record that Hufstetler was susceptible to coercion or that his will was actually overcome, the Court ultimately found Hufstetler's confession voluntary. *Hufstetler*, at 26.

a) *The credible threats against the defendant were patently inappropriate*

Moving on to the facts of this case, contrary to Craig in *Hufstetler*, who was under arrest well before Hufstetler confessed, Mr. Vidal was never a co-suspect with the defendant, nor was there ever probable cause to suspect him of having committed a crime.

Indeed, when counsel for the defendant cross examined Agent Ríos, he was asked whether it was correct that "at no time was José Vidal, Mr. Vidal's father, a suspect in your investigation." In response, Agent Ríos answered, "Correct." Docket No. 88 at 139. When asked if he had any information that Mr. Vidal was carrying firearms, Agent Ríos said no. *Id*. And when asked if he had any reason to believe that Mr. Vidal was involved in any crimes, Agent Ríos said, "the father, no." *Id*.

When Agent Díaz was asked by counsel, why Mr. José Vidal was not handcuffed in the photo taken while he was being shown the Warrant, Agent Díaz remarked that no crime had been committed, and "Mr. José Vidal didn't represent a danger to us." Docket No. 191 at 33. And, when Agent Díaz was asked if the defendant's father was the target of any investigation, he responded by saying, "Mr. José Vidal, no." Docket No. 191 at 69. Simply put, Mr. Vidal was not on any law enforcement radar, neither before, during, nor after the execution of the Warrant. In fact, other than merely being present in his home on August 5, 2022, there is no evidence to demonstrate that Mr. Vidal had any knowledge of the existence or presence of the firearm in his home. After all, the firearm was found in a black bag under the bed of Mr. Vidal's 32-year-old adult son. It was not found in a location where Mr. Vidal would likely come in contact with it. Moreover, Mr. Vidal was never

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 67

read his *Miranda* rights as is typically done with suspects placed under custody[39] (docket no. 88 at 135, lines17-18), nor was he interviewed at any time by law enforcement. It is clear to the Court, therefore, that Mr. Vidal's arrest was little more than an effort by the agents to carry through with their hollow threats and maintain the pressure on the defendant to confess about the presence of the firearm.

Notwithstanding his mere presence at this home on the day of the execution of the Warrant, Mr. Vidal testified credibly[40] that upon entering his home to execute the Warrant, a supervisory agent started to pressure his son, ordering him to tell the agents where the contraband was or else they would arrest Mr. Vidal too. Docket No. 211 at 126 ("We are going to take your father also if you don't tell us what we want to find."). Mr. Vidal said that the police pressure persisted "the entire time" while police searched his home. Docket No. 211 at 129. Mr. Vidal also testified that the supervisory agent threatened him as well by saying that, "[I]f you know that there's something here, you should say so, tell me or I'm going to arrest you too. Tell your son to tell because I will take him and arrest him." DE211 at 129. Notwithstanding those threats, Mr. Vidal denied knowing anything about the investigation. DE-211 at 129.

Then, after the PRPB agents located the firearm and ammunition under the defendant's bed, both the defendant and his father were placed under arrest. The excuse given by Agent Díaz for placing them both under arrest was that "since the search warrant is against the structure, once the crime has been found, all the people in the structure then are taken to the police station, to the CIC." Docket No. 191 at 42.

---

[39] Agent Ríos testified that "[t]he Miranda Warnings [are] for a person who is a suspect in custody." Docket No. 88 at 135, lines 17-18.

[40] Not only did Mr. Vidal testify credibly, there is simply no evidence in the record to dispute that those statements were made. While Agent Díaz did state during the hearing that he never made any statements about the Mr. Vidal to the defendant, by all accounts, the agent who made the statements to Mr. Vidal was someone other than Agent Díaz. During the hearing, that supervisory agent was identified as "Indian" looking. Other than Agent Díaz, no one else from the search team testified. Moreover, simply noting that Mr. Vidal is biased because he is the defendant's father, as the Government did in its Post-Hearing Opposition, offers little assistance to the Court in deciding the issue.

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 68

Mr. Vidal testified that before being placed in the patrol car, the supervisory agent approached the defendant again and said, "I told you so[,] that if you wouldn't tell me where . . . everything [was], I was going to take your father away. Now there's no break. I'm going to take him[,] arrested[,] and I'm going to take you." *Id.* 132.

Mr. Vidal said that once they arrived at the police station, that same supervisory agent, once again, addressed the defendant saying something to the effect that, "See what's happening? Your father is arrested. I told you. I gave you a chance to talk to me and you wouldn't talk to me. Now I arrested you and I arrested your father and he's here nervous." He said the agent then asked his son if he knew anything about some murders that had happened around the area and that his son answered, "no, what do you think I am? I don't know anything about that. Go ask a different person." *Id.* at 135.

Based on the totality of the circumstances, including the anonymous tip indicating that the firearm and ammunition belonged to the defendant and that, at times, he carried it in his waistband, no prudent person would have believed that the defendant's elderly father possessed the firearm found under the defendant's bed in his bedroom. Furthermore, to the extent that Viviannette had knowledge of its existence and had seen it at her home or at her work does not mean that Mr. Vidal knew about its existence or had ever seen it inside his house before. Therefore, the Court cannot say under any conceivable circumstances that there was probable cause to arrest the defendant's father. *See United States v. Andrews*, 847 F. Supp. 2d 236 (D. Mass. 2012) ("Based on the totality of all of the known circumstances, including the informant's report that the guns were the defendant's, no prudent person would have believed that Andrews' elderly, ill mother possessed those guns, which were found hidden in a closet in a bedroom that the officers, at that time, had no information indicating had been her bedroom. Therefore, there was not, in any event, probable cause to arrest Andrews' mother, and ATF Special Agent Scott Heagney knew this.") *See also United States v. Fiasconaro*, 315 F.3d 28, 34–35 (1st Cir. 2002) ("Probable cause exists when the facts and circumstances within [the police officers']

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 69

knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." (internal quotations and citations omitted)).

> b) *The Court finds that the defendant was susceptible to the specific threats levied at him by the supervisory agent.*

At the outset, the defendant is a 32-year-old adult who still lives with his parents. The record indicates that he has never lived independently from his parents. He also suffers from some mental deficiencies, though the Court finds those deficiencies not serious enough to hinder his ability to understand certain things, like waiving his *Miranda* rights. His relationship with his father, who Agent Díaz himself described as an "elderly" man (docket no. 191 at 66), is extremely close. That is clear from the concern that the defendant exhibited for his father during both the execution of the Warrant and the custodial interview. For example, during his custodial interview, the defendant, unprompted by the agents, made comments like, "Man, he, he sends me money. . . He sends me money for the Commissary. I came out of the hospital intoxicated, he was there." Docket No. 239-2 at 23. In addition, the defendant raised the subject of his father no less than nine times during his interview with the ATF Agents trying desperately to get his father out of the predicament that he had put him in. For example, almost immediately after waiving his right to remain silent, the defendant said to the agents, "Man, yes, I want to get my dad out." Docket No. 239-2 at 14. A short time later he commented, "Well, yes, I want to get my dad out of this. To have them take me only. My dad has nothing to do with anything." *Id.* at 15. Then a few minutes later, he said, "They took my wallet and kept looking and they found my gun and I said: "Look, that's mine, he has nothing to do with it, you know? That's my dad." *Id.* at 19. And finally, the defendant pleaded, "Yes, yes. But really, I, well . . . I know that, that really . . . Well, my family won't like this, but I would like to get my dad out of here really. Man, yes." *Id.* at 23.

Clearly, the defendant exhibited a notable psychological and emotional anxiety about the well-being of his father during his custodial interview. In addition,

*United States v. Alexis Vidal-Collazo*
Crim. No. 22-356 (ADC-MDM)
Report and Recommendation

Page 70

Mr. Vidal testified that while they were at the police station, he saw his son crying. *Id.* at 136. This fact was confirmed by Agent Ríos during his testimony. Docket No. 88 at 134. Evidently, the threats to arrest his father had their intended effect.[41]

In conclusion, the Court finds that although the Government did demonstrate by preponderance of the evidence that the defendant had the capacity to, and if fact did, waive his right to remain silent, given the defendant's very close relationship with his father, given the defendant's mental and emotional deficiencies, and given the fact that there was no legal basis to arrest his father for any crime, the threats that were made by the agents vitiated the defendant's consent such that his confession to ATF agents during his custodial interview is deemed involuntary. For that reason, the Court **RECOMMENDS** that defendant's recorded confession be suppressed and that the Government be prohibited from using any part of it in their case-in-chief.

### III.    CONCLUSION

For the reasons espoused above, the undersigned hereby **RECOMMENDS** that the defendant's *Motion to Suppress* (Docket No. 30) be **GRANTED** and that the firearm evidence be suppressed together with the defendant's custodial interview as the fruit of the illegal search. Separately, the Court also **RECOMMENDS** that the defendant's custodial interview with ATF agents be suppressed because it was the result of coercion and intimidation and was otherwise involuntary.

**IT IS SO RECOMMENDED**.

The parties have fourteen days to file any objections to this Report and Recommendation. Failure to file the same within the specified time waives the right to appeal this Report and Recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d

---

[41] The government argues that Mr. Vidal's testimony should not be believed because he is biased and his testimony is uncorroborated. Docket No. 254 at 13. The Court disagrees, the fact that there was no legal basis for the threats to arrest Mr. Vidal, yet he was arrested anyway, does serve as corroboration that the threats were carried out.

---

143, 150-51 (1st Cir. 1994); *United States v. Valencia Copete*, 792 F.2d 4 (1st Cir.
1986).

      In San Juan, Puerto Rico, this 10th day of January 2025.

                    s/ *Marshal D. Morgan*

                    Marshal D. Morgan
                    United States Magistrate Judge
                    for the District of Puerto Rico